
DA 10-0434

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 73

HEIDI R. HENDERSHOTT,

      Petitioner and Appellant,

   v.

JESSE B. WESTPHAL,

      Respondent and Appellee.

APPEAL FROM:   District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DR 07-351C
Honorable Stewart E. Stadler, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Monte Jewell, Attorney at Law; Missoula, Montana

      For Appellee:

          Jesse B. Westphal, (self-represented); Kila, Montana

Submitted on Briefs:  February 16, 2011

Decided:  April 12, 2011

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1　Petitioner Heidi Hendershott appeals from the Eleventh Judicial District Court's order denying her motion pursuant to M. R. Civ. P. 59(g) to amend the final parenting plan by striking the provision requesting alternative dispute resolution.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2　Pursuant to this Court's order to seal the record in this case, we have limited any reference to sensitive confidential information in the following factual summary and include those facts necessary to our analysis of the issue presented. Petitioner Heidi Hendershott and respondent Jesse Westphal were married in 1999, in Flathead County, Montana, where they resided throughout their marriage. Heidi filed a petition for dissolution and proposed parenting plan in 2007. Prior to filing for dissolution, Heidi obtained an order of protection against Jesse. Heidi's proposed parenting plan sought to allow Jesse supervised visits with the parties' two children at the Nurturing Center in Kalispell until Jesse worked his way to age appropriate visitation.

¶3　Heidi's affidavit in support of an interim parenting plan described "increasing levels" of physical and emotional abuse to which she could no longer subject herself or their children. Heidi alleged Jesse would frequently become enraged and had trouble controlling his anger. Heidi also alleged that their children had witnessed his actions and started to justify Jesse's behavior.

¶4　The District Court approved Heidi's proposed parenting plan as an interim parenting plan and set a hearing on the order of protection and the parenting plan. After hearing from both parties, the District Court modified the plan and granted Jesse age

2

appropriate visitation. The court ordered that the order of protection remain in effect and be modified only to account for visitation. The court also ordered that an independent parenting plan evaluation be conducted by Dr. Edward Trontel.

¶5 Heidi refused to meet with Jesse during Dr. Trontel's evaluation, which Dr. Trontel claimed "perturbed" his examination process. Dr. Trontel ultimately opined that "there is no way to conclude, with absolute certainty, that serious endangerment is nonexistent. However, there is no empirical foundation to conclude with reasonable confidence that Mr. Westphal poses a serious danger to Ms. Westphal or her children."

¶6 On December 7, 2007, Heidi also underwent an evaluation by Dr. Christine Fiore, a Licensed Clinical Psychologist. Dr. Fiore opined that difficulty in Heidi's marriage, with ongoing traumatic experiences, has resulted in post traumatic stress disorder. Dr. Fiore explained that post traumatic stress disorder is a diagnosis commonly found in women who experience ongoing emotional or other abuse in their relationships. Dr. Fiore further concluded that continued contact with Jesse would exacerbate Heidi's symptoms.

¶7 On March 3, 2008, the parties stipulated to a new interim parenting plan. By agreement, the order of protection entered against Jesse was dismissed. The stipulated interim parenting plan identified an exchange point for the children and allowed for either parent to request the presence of law enforcement. It further stipulated that Heidi and Jesse would only communicate through a written parenting journal. The stipulated plan omitted any provision for the mediation of disputes over the parenting plan. As part of

the new interim parenting plan, Heidi and Jesse agreed to undergo a supplemental parenting evaluation by Dr. Paul Silverman, a Licensed Clinical Psychologist.

¶8 Heidi consistently requested that an officer of the Kalispell Police Department be present during child exchanges. After the Kalispell Police Department complained of Heidi's frequent request for "stand by" officers, Heidi, with the assistance of her family, hired uniformed security guards to accompany her. After the children's visits with Jesse, Heidi claimed the children were timid and uncomfortable.

¶9 On December 26, 2008, Dr. Silverman completed a parenting plan evaluation of Jesse, Heidi, and the children. Dr. Silverman opined that "[d]etermining whether Jesse was abusive during their marriage is extremely difficult and the truth may only be known by Jesse and Heidi." Dr. Silverman did note that Heidi's alleged abuses included constant put downs and rages and that Jesse would tell Heidi he owned her body and she should do what he wants her to do. However, Dr. Silverman concluded that these allegations, as well as other observations of Jesse's behavior, led him to question whether abuse actually was occurring or if Heidi's allegations were merely her own interpretations of Jesse's behavior. Dr. Silverman noted that Jesse agreed he had not been a "Godly husband" and acted towards Heidi in a way that contributed to the end of their marriage. While Dr. Silverman did not find evidence of physical or sexual abuse, he found Jesse to be insensitive and intolerant of others, that he had difficulty managing his anger, and that he viewed the relationship in a traditional male-dominated manner. Dr. Silverman also noted Heidi was inhibited socially, had low self esteem, and suffered from stress and anxiety which caused physical symptoms.

4

¶10     Dr. Jennifer Robohm, a Licensed Clinical Psychologist and Heidi's individual therapist, responded to Dr. Silverman's Parenting Evaluation Report with a number of concerns about Dr. Silverman's methodology and observations. Dr. Robohm specifically noted that even though Heidi had been seeing her for six months, Dr. Silverman did not consult Dr. Robohm for her impressions. She further explained that many of the anecdotes Heidi shared with Dr. Silverman were consistent with experiences of abuse victims but were not included in his report.

¶11     On February 28, 2009, Dr. Robert Geffner, a Licensed Psychologist, reviewed Dr. Silverman's report and completed a forensics consultation. Dr. Geffner noted that Dr. Silverman's report failed to account for the children's problematic behavior before or after visits with Jesse or Jesse's difficulty managing his anger. Dr. Geffner also noted many red flags for potential abuse, including power and control issues he claimed were disregarded by Dr. Silverman. Dr. Geffner concluded Heidi displayed many behaviors and traits of an abused woman and recommended Jesse undergo psychotherapy with an abuse specialist.

¶12     At trial, both Heidi and Jesse presented testimony regarding Heidi's abuse allegations. The District Court heard testimony from Heidi, Jesse, Dr. Trontel, Dr. Silverman, Dr. Fiore, Dr. Robohm, and Dr. Geffner, among others.

¶13     Heidi testified, as she told Dr. Silverman, that Jesse believed her body belonged to him, not to her, and that he expected her to do whatever he said. Heidi stated she lived in fear of Jesse. Heidi's counsel also presented a letter, written by Jesse, which read, in part, "[i]t is so dumb because I don't want to control you or dominate you or abuse you or

5

manipulate you, but that's what I have done, but I sure couldn't see it." Upon questioning Jesse stated, "I could see places where, yes, I could be viewed as a controlling person or a manipulative person."

¶14 On January 13, 2010, the District Court issued a decree of dissolution, along with findings of fact regarding Heidi's abuse allegations. The court reviewed the opinions of the trial witnesses and stated, "[t]he Court finds that Dr. Silverman was the only professional person who performed and completed a parenting evaluation and that his final evaluation followed accepted standards which support his conclusions and recommendations." The court summarized Dr. Silverman's recommendations, including the following:

> Communication between Petitioner and Respondent concerning the children should be accomplished by the existing journal, email, or any other method agreeable to both parties.

> With no direct contact by the parents, medical information should be shared by the parties but actual appointments attended by only the parent who scheduled the appointment.

> Child exchanges between the parties should take place in the vicinity of the parties' residences through neutral third parties with no direct contact between Petitioner and Respondent . . . .

¶15 The District Court concluded:

> [I]t is in the best interests of the parties' children to continue, as a final parenting plan, the previously approved Interim Parenting Plan of March, 2008. The children are to reside primarily with Petitioner with Respondent having parenting time as indicated in the Interim Plan. . . . With the exception of the recommendation by Dr. Silverman that parenting time be increased . . . the Court finds that Dr. Silverman's other recommendations, listed above, as to direct contact, exchanges, communication between the parents, phone contact, public school, and medical appointments, are in the

6

best interests of the children and are to be incorporated in the parties' final parenting plan.

¶16 The court directed Jesse's counsel to prepare a final parenting plan based on the court's findings. Heidi objected to Jesse's proposed parenting plan on the ground that, pursuant to § 40-4-301(2), MCA, the final parenting plan should not include a mandatory mediation provision.

¶17 The District Court ultimately approved and ordered a final parenting plan. The plan specified that communication between the parties be with "no direct contact" and that "all non-emergency communication between mother and father should be accomplished in writing." Section IV of the final parenting plan included the following requirement:

> If not resolvable between the parties themselves, disputes concerning issues addressed in this Plan, other than as to child support, shall be submitted to a mediator (e.g. counselor, attorney) agreed upon by both parties. Any mediation should be structured to avoid direct contact by the parties, either with separate sessions or submission in writing.

Heidi then moved under M. R. Civ. P. 59(g) to alter the District Court's judgment and final parenting plan, pursuant to § 40-4-301(2), MCA, by striking the alternative dispute resolution provision. Heidi argued it would be an abuse of discretion for the District Court to disregard § 40-4-301(2), MCA. Heidi cited expert testimony from trial, the court's acknowledgment of the risks in ordering the parties to communicate in writing, and her own testimony that Jesse was "emotionally controlling" and that being forced to meet with him made her fearful and nervous. Jesse contended mediation was appropriately included in the final parenting plan.

7

¶18 The District Court denied Heidi's motion. Heidi now appeals, claiming error in the court's imposition of mandatory alternative dispute resolution.

## STANDARD OF REVIEW

¶19 We review for correctness a district court's interpretation and application of statutes. *Kulstad v. Maniaci*, 2009 MT 326, ¶ 50, 352 Mont. 513, 220 P.3d 595.

## DISCUSSION

¶20 This case requires the interpretation of § 40-4-301, MCA, a matter of first impression for our Court. When interpreting a statute, we look first to the plain meaning of its words. *Marriage of Christian*, 1999 MT 189, ¶ 12, 295 Mont. 352, 983 P.2d 966. This Court operates under the presumption that the Legislature does not pass meaningless legislation, and we will harmonize statutes relating to the same subject in order to give effect to each statute. *State v. Brendal*, 2009 MT 236, ¶ 18, 351 Mont. 395, 213 P.3d 448. We also presume the Legislature acts with deliberation and full knowledge of all existing laws on a subject. *Id.*

¶21 Section 40-4-301(1), MCA, grants a district court the discretion to require parties to participate in mediation of a family law proceeding:

> The district court may at any time consider the advisability of requiring the parties to a proceeding under this chapter to participate in the mediation of the case. Any party may request the court to order mediation. If the parties agree to mediation, the court may require the attendance of the parties or the representatives of the parties with authority to settle the case at the mediation sessions.

Heidi first argues that this section allows the court to order mediation only where both parties consent. We disagree. The first sentence of the statute plainly gives the court

authority to *require* mediation. In the alternative, a party may *request* mediation or both parties may *agree* to mediation. In the event mediation occurs by agreement of the parties, the court nonetheless may *require* attendance of certain persons at the mediation. Subsection (1) does not limit the court's ability to order mediation. Because we find the statute to be plain, unambiguous, direct and certain, the statute speaks for itself and there is no need to resort to extrinsic means of interpretation. *Christian*, ¶ 12.

¶22 However, § 40-4-301(2), MCA, makes an explicit exception to court-ordered mediation:

> The Court may not authorize or permit continuation of mediated negotiations if the court has reason to suspect that one of the parties or a child of a party has been physically, sexually, or emotionally abused by the other party.

This subsection's plain language prohibits court-ordered mediation where there is a reason to suspect abuse.

¶23 Jesse argues that subsection (2) of § 40-4-301, MCA, is in conflict with the final parenting plan criteria listed in § 40-4-234, MCA. Section 40-4-234(4), MCA, states "[t]he Court may in its discretion order the parties to participate in a dispute resolution process to assist in resolving any conflicts between the parties regarding adoption of the parenting plan." While § 40-4-234(4), MCA, invokes the court's discretion to order mediation, it does not *require* a court to include an alternative dispute resolution provision in a parenting plan and is silent on the subject of mediation in instances of domestic abuse. Section 40-4-301(2), in contrast, prohibits mediation in all family law matters if there is reason to suspect abuse.

9

¶24 "Reason to suspect" sets a minimal standard that the legislature expressly considered and included in the law. Section 40-4-301, MCA, was enacted in 1993. *See* 1993 Mont. Laws ch. 199, sec. 1. During the Senate Judiciary Committee's discussion of the bill, Senator Halligan, the bill's sponsor, stated the "reason to suspect" standard was used because it was lower than probable cause and consistent with doctor and teacher standards for investigating abuse. Mont. S. Jud. Comm., *Executive Action on SB 117*, 53rd Reg. Sess. 2 (Jan. 25, 1993).

¶25 The Senate Judiciary Committee also added evidence of "emotional abuse" as a specific reason to prohibit court-ordered mediation. *See* Mont. S. Stand. Comm. Rpt., 1993 Legis., 53rd Reg. Sess. 1 (Jan. 26, 1993). Senator Halligan explained that a reason to suspect emotional abuse should prohibit mediation due to the significant difficulties in mediating a conflict where one person is intimidated by another. Mont. S. Jud. Comm., *Executive Action on SB 117*, 53rd Reg. Sess. 2 (Jan. 25, 1993). Given the plain language of the statute, together with its legislative history, it is clear the Legislature intended § 40-4-301(2), MCA, as an absolute bar to mediation where the court finds a reason to suspect abuse.

¶26 Our interpretation finds support in the legislative history of § 40-4-234, MCA, enacted in 1997. *See* 1997 Mont. Laws ch. 343, sec. 19. In that legislation, the Legislature sought to neutralize the terminology used in parenting determinations and to provide direction for parenting plans, including specific provisions in the best interest of the child. *See generally* 1997 Mont. Laws ch. 343. Section 40-4-234(4), MCA, was specifically added to encourage mediation because mediation is an effective approach to

creating and enforcing parenting plans. *See* Mont. H. Jud. Comm., *Hearing on HB 231*, 55th Reg. Sess., ex. 5 (Jan. 29, 1997); s*ee also* Laurel Wheeler, *Mandatory Family Mediation and Domestic Violence*, 26 S. Ill. U.L.J. 559, 563 (2002) (citing Sarah R. Cole, et al., *Mediation: Law, Policy and Practice*, § 12:2, 122-23 (2d ed., West 2002)). However, the basic rules, assumptions, and goals of mediation are undermined in those particular cases when the parties have a history of domestic violence. David Frazee, Ann M. Noel, and Andrea Brenneke, *Violence Against Women: Law and Litigation*, § 16:45, 16-60 (West 1998) (when there is evidence of violence, mediation is not effective because the parties have unequal bargaining power); *accord* Andree G. Gagnon, *Ending Mandatory Divorce Mediation for Battered Women*, 15 Harv. Women's L.J. 272, 272-92 (1992); Leigh Goodmark, *Alternative Dispute Resolution and the Potential for Gender Bias*, 39 Judges' J. 21, 22 (Spring 2000).

¶27    The legislative history indicates the Legislature was aware of these concerns and did not intend the law to require alternative dispute resolution provisions without regard to domestic abuse. The title of the 1997 Act stated that the bill provided "an option for dispute resolution or mediation except in cases of proven child or spousal abuse." 1997 Mont. Laws ch. 343, sec. 1. "Consideration of the title of the Act through which the statute was introduced is a necessary first step in the search for the purpose and meaning of the statute." *Montana Dep't of Nat. Resources & Conserv. v. Clark Fork Logging Co.*, 198 Mont. 494, 496, 646 P.2d 1207, 1208 (1982).

¶28    By allowing a court discretion to include a mediation provision in a parenting plan, the Legislature merely encouraged practitioners and courts to consider alternative

11

dispute resolution for future conflicts. The discretionary language of § 40-4-234, MCA, as well as the legislative history, make clear the Legislature did not seek to override the exception in § 40-4-301(2), MCA, to mediation of parenting conflicts in instances of abuse. We therefore conclude that § 40-4-234(4), MCA, and § 40-4-301(2), MCA, are not in conflict. Instead, both provisions afford court discretion in ordering mediation, unless there is reason to suspect emotional, physical, or sexual abuse in the relationship.

¶29 Heidi relied on § 40-4-301(2), MCA, in requesting the District Court to strike the alternative dispute resolution provision contained in the parenting plan. She argued the law specifically prohibits the alternative dispute resolution provision because her testimony and the testimony of many professionals at trial established that Heidi and Jesse have an emotionally abusive relationship. Heidi referenced testimony that she suffers from post traumatic stress disorder and fears interacting with Jesse. Dr. Robohm, Dr. Fiore, and Dr. Silverman all testified that Heidi would be significantly traumatized by forced interaction with Jesse. Although Jesse admitted to controlling and dominating Heidi during their marriage and to having trouble controlling his anger, he denied abuse and urged the court to include mandatory mediation in the parenting plan.

¶30 In its final decree, the District Court reviewed the various experts' testimony and concluded that Dr. Silverman was the only professional person who performed a complete parenting evaluation. The court's adoption of nearly all of Dr. Silverman's recommendations indicates it found his testimony credible. While the court noted the conflicting evidence of abuse, it did not find whether there was "reason to suspect" that either physical, sexual or emotional abuse was present in the relationship. In its

12

post-decree order denying Heidi's motion to strike the alternative dispute resolution provision from the proposed final parenting plan, the District Court did not discuss its factual findings, Jesse's admission of controlling and dominating behavior, Heidi's post traumatic stress disorder, or other evidence presented at trial. Instead, the District Court attempted to accommodate Heidi's concerns and other no-contact provisions of the parenting plan by requiring that "[a]ny mediation should be structured to avoid direct contact by the parties." Section 40-4-301(2), MCA, however, does not afford discretion to design a special mediation procedure.

¶31 In construing and applying statutes, courts are not at liberty to "insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. We conclude that § 40-4-301(2), MCA, explicitly prohibits courts in family law proceedings from authorizing or continuing mediation of any kind where there is a reason to suspect emotional, physical, or sexual abuse.

¶32 We therefore hold that the District Court erred as a matter of law by failing to apply § 40-4-301(2), MCA. The statute does not require proof of abuse by clear and convincing evidence, a preponderance of the evidence, or even probable cause, but simply a "reason to suspect." Jesse's admission in writing and at trial, the testimony of Dr. Silverman, which the District Court found credible, and other evidence presented at trial provide sufficient evidence of reason to suspect that Heidi and Jesse's relationship was emotionally abusive. By the express language of § 40-4-301(2), MCA, alternative dispute resolution may not be mandated in this case.

¶33 As a final matter, we note that while the plain language of § 40-4-234(4), MCA, does not undermine § 40-4-301(2), MCA, a slightly different prohibition on mediation is reflected in § 40-4-219, MCA. That section, governing the process for amending a parenting plan, states that "except in cases of *physical* abuse or threat of physical abuse . . . the court may, in its discretion, order the parties to participate in a dispute resolution process to assist in resolving any conflicts . . . regarding amendment of the parenting plan." Section 40-4-219(9), MCA (emphasis added). While this case does not call for the application of § 40-4-219, MCA, the Legislature may wish to consider the potential conflict between its reference to physical abuse and the more expansive reference to abuse in § 40-4-301(2), MCA.

¶34 We reverse and remand to the District Court with instructions to strike Section IV, the alternative dispute resolution provision, from the final parenting plan, and for appropriate modification of other provisions in the plan that make reference to Section IV.

/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS
/S/ JIM RICE