

DA 11-0165

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2012 MT 226

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

BOBBY COOKSEY,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fourteenth Judicial District,
In and For the County of Musselshell, Cause No. DC 09-13
Honorable Randal I. Spaulding, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Wade M. Zolynski, Chief Appellate Defender, Shilo Hernandez,
Assistant Appellate Defender, Helena, Montana

            Robin A. Meguire, Attorney at Law, Great Falls, Montana

      For Intervenor Debra Cooksey:

            Carl B. Jensen, Jr., Attorney at Law; Great Falls, Montana

      For Appellee:

            Steve Bullock, Montana Attorney General; Jonathan M. Krauss,
Assistant Attorney General, Helena, Montana

            Kent Sipes, Musselshell County Attorney, Roundup, Montana

Submitted on Briefs:  June 6, 2012
Decided: October 9, 2012

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 In September 2010 a jury in the Fourteenth Judicial District Court, Musselshell County, convicted Bobby Cooksey of deliberate homicide. The District Court sentenced Cooksey to a term of fifty years in the Montana State Prison with credit for time served, and Cooksey appeals. We affirm.

¶2 Cooksey presents the following issues for review: (1) whether the District Court properly denied Cooksey's motion for a new trial; (2) whether the District Court properly excluded Cooksey's offered evidence concerning the presence of the drug Paxil in the deceased's blood; (3) whether the State was required to conduct an investigation to discover evidence to support Cooksey's claim of justifiable use of force; and (4) whether the prosecutor's closing argument amounted to prosecutorial misconduct.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3 Cooksey lived in a rural area outside of Roundup, Montana and one of his neighbors was Tracey Beardslee. Beardslee's access to his property was via a road easement that crossed Cooksey's property. Beardslee had lived adjacent to Cooksey for several years and the two had several verbal altercations. On July 7, 2009, Cooksey, by his account given to law enforcement investigators, heard his dogs barking and left his house armed with a large-bore lever-action rifle. He walked toward his dogs and saw Beardslee using a weed-whacker to clear weeds along the margins of the easement. Cooksey walked toward Beardslee and asked him what he was doing on Cooksey's property. Cooksey claimed that Beardslee then "went off," cussed him, said he would kick Cooksey's ass, and finally that he would kill Cooksey. At that moment Cooksey

2

lifted his rifle and fired, sending a bullet through Beardslee's chest and killing him. Cooksey returned to his house, called 911, and reported that he had shot Beardslee.

¶4 Musselshell County deputies responded to the call, secured the scene and called in the State Division of Criminal Investigation to investigate the incident. The responding deputies obtained Cooksey's consent to secure the weapon he used. Later that day a State investigator arrived and took Cooksey's voluntary statement about what had happened. The investigation determined facts about the background relationship between Cooksey and Beardslee; about what Cooksey saw and what he did; and about what Beardslee did based upon Cooksey's account. The investigation obtained a chemical analysis of Beardslee's blood and, at the request of the defense, a second analysis at a laboratory in Pennsylvania.

¶5 By Cooksey's own admission Beardslee had never physically attacked him and did not do so on the day he died. When Cooksey fired the shot there was a wood pole fence and a barbed wire fence between him and Beardsley, and Beardsley was still weed whacking and was moving back toward his own house. Cooksey observed a folding knife in a case on Beardslee's belt but never saw him pull it out.

¶6 Other facts will be noted as necessary to discuss the issues raised on appeal.

## STANDARD OF REVIEW

¶7 The standard of review will be discussed in regard to each issue.

## DISCUSSION

¶8 *Issue One: Whether the District Court properly denied Cooksey's motion for a new trial based upon juror misconduct.*

3

¶9 A convicted defendant may move for a new trial within 30 days of the guilty verdict. The motion must be in writing, must specify the grounds for a new trial, and must be served upon the prosecution. The district court may grant a new trial "if required in the interest of justice." Section 46-16-702, MCA. Cooksey's motion for a new trial was based upon several grounds. He subpoenaed several witnesses to testify at the hearing on the motion, which occurred on December 3, 2010. The District Court subsequently denied the motion in a written order.

¶10 A district court's decision on a motion for a new trial and its decision on issues of jury impartiality are reviewed for abuse of discretion, *State v. Dunfee*, 2005 MT 147, ¶ 14, 327 Mont. 335, 114 P.3d 217, unless the specific issue requires a different standard of review, *State v. Ariegwe*, 2007 MT 204, ¶ 164, 338 Mont. 442, 167 P.3d 815. A district court commits an abuse of discretion when it acts arbitrarily, without conscientious judgment, and exceeds the bounds of reason in a way prejudicial to the defense. *Ariegwe*, ¶ 164.

¶11 First, Cooksey contends that there was structural error prior to the start of trial. He contends that some prospective jurors made improper and prejudicial statements while the prospective jurors were waiting in a church basement meeting room near the courthouse. Prior to trial the District Court determined that there was not sufficient room in the courthouse to safely and adequately accommodate all the 80 or so prospective jurors prior to commencement of jury selection. The District Court decided to hold the prospective jurors, identified as such by stickers they were given when they signed in, and accompanied by two bailiffs, in a church basement meeting room near the courthouse

4

until jury selection began. The District Court explained this to the prosecution and the defense well before the start of trial, and neither side made any objection or requested that any other steps be taken. Specifically, neither side requested that any cautionary instructions be given.

¶12 On the morning of the first day of trial the District Court concluded the final pretrial conference with the prosecution and defense and considered several requests from prospective jurors that they be excused. The prospective jurors were then escorted to the courtroom, there was a roll call, and the prospective jurors were sworn to truly answer all questions asked of them. By the District Court's own description, there were no time limits or restrictions on voir dire and the attorneys were permitted to ask "every question they desired of the prospective jurors, including whether they could put aside anything they had heard about the case and render a fair and unbiased decision based only upon the evidence presented in court."

¶13 Second, Cooksey alleges error within the jury deliberation process itself. Cooksey offered evidence that seated juror Beres commented during deliberations that the decedent Beardslee visited her mother's house, and would cease being loud or verbally abusive when Beres' mother asked him to do so. This would establish that at least the juror's mother knew the decedent and that the juror had discussed the decedent with her mother.

¶14 After trial and at the hearing on the motion for a new trial, Cooksey presented the testimony of prospective juror Mark Lurie, who contended that there was a loud "circus atmosphere" in the church basement, that at least one prospective juror was loudly

5

proclaiming Cooksey's guilt, and that bailiffs were nowhere to be seen. Prospective juror Newman, who was ultimately excused, testified that she heard prospective juror Simms, who was also excused, express his opinions that the killing was wrong and that it was not right to kill someone in cold blood. Other persons who were present heard other statements that they could no longer recall.

¶15   Witness Roy Dickerson, who was presented by the State, had also been a prospective juror in the church basement. He testified that there was no loud circus atmosphere, but that the gathering of jurors was subdued and somber. He testified that it was in fact Mr. Lurie who was talking loudly and incessantly about his claimed legal experience and knowledge of the legal system, to such an extent that he would be surprised if Lurie heard anything that anyone else said. Dickerson testified that the bailiffs were clearly identified with name tags and that he did not hear negative comments about either side of the case. None of the other witnesses who testified at the motion hearing corroborated Lurie's account of the atmosphere and content of discussions in the church basement.

¶16   The District Court specifically found that Lurie's account of the matter was not credible and that Dickerson's testimony was "completely credible." Despite Lurie's professed attention to detail, he could not remember important details on cross-examination, and while claiming to have a guilty conscience based upon what he had witnessed, never reported it to anyone until after he learned of the guilty verdict. At that time he contacted the defense. The District Court also found that Lurie's demeanor while testifying was the same as that observed by Dickerson in the church basement. The

District Court specifically found that while testifying at the hearing, Lurie "spoke loudly and incessantly until interrupted by the court and counsel"; that he was "overly eager to talk about his experience as a fraud investigator/threat analyst and his purported prior experience with the court system"; that his testimony was "self aggrandizing"; and that "he appeared intent on presenting himself in an overly virtuous manner" while being "gratified to be the center of attention."

¶17 It is the District Court's province to determine the weight of the evidence. *Albert v. Hastetter*, 2002 MT 123, ¶ 30, 310 Mont. 82, 48 P.3d 749. We conclude that the District Court did not abuse its discretion in rejecting Lurie's version of events.

¶18 As to alleged misconduct during the jury deliberations, M. R. Evid. 606(b) materially circumscribes evidence that may be given by a juror "[u]pon inquiry into the validity of a verdict." In summary, Rule 606(b) allows for juror testimony to impeach a verdict "only if the evidence is used to determine whether the jury was influenced by extraneous, prejudicial information, or any outside influence, or whether a particular juror has reached a specific determination as a result of chance." *State v. Hoffman*, 2003 MT 26, ¶ 50, 314 Mont. 155, 64 P.3d 1013. (Rule 606 prohibits a juror from giving evidence that defendant would have been convicted of a lesser offense if a lesser included offense instruction had been given.) Juror testimony or evidence may be admitted only to establish that the jury was subjected to external influence such as a juror obtaining information about previous litigation, a visit to the scene of the incident, or bringing newspaper articles to the jury. *State v. Kelman*, 276 Mont. 253, 262, 915 P.2d 854, 860 (1996).

¶19 It is established that "knowledge and information shared from one juror to another or others is not an extraneous influence" which may be proven by evidence admissible under M. R. Evid. 606(b). *Kelman*, 276 Mont. at 262, 915 P.2d at 860 (juror statement during deliberations that defendant owned a strip joint was not admissible to impeach the verdict). Examples of inadmissible "internal influences" on the jury include the jury's use of "demonstrative evidence or experimentation with the evidence; pressure by other jurors; and knowledge and information shared from one juror to another or others." *State v. Lawlor*, 2002 MT 235, ¶ 12, 311 Mont. 493, 56 P.3d 863.

¶20 Rule 606(b) as previously construed by this Court applies here and precludes the types of verdict impeachment posited by Cooksey. The alleged statements, even if they had been established as fact, would have been at most internal influences, insufficient to alter the outcome of the case and inadmissible under M. R. Evid. 606(b). The Beres information was not properly admissible under Rule 606(b). It is analogous to the juror statement in *Kelman* that the defendant owned a strip bar, and that statement was excluded under Rule 606(b). *Kelman*, 276 Mont. at 262, 915 P.2d at 860; *McGillen v. Plum Creek Timber Co.*, 1998 MT 193, ¶ 20, 290 Mont. 264, 964 P.2d 18 (juror disclosure during deliberation that he knew a witness is internal influence and not admissible). The Beres statement was not prejudicial, rather it was at most ambiguous and did not obviously help or hinder the defense. On the one hand the statement might be construed to show Beardslee to be a compliant houseguest, while on the other it might show him to be obnoxious in another's home.

8

¶21 Moreover, the Beres evidence was not disclosed to the prosecution in the motion for a new trial as required by § 46-16-702, MCA. The District Court was therefore within its discretion to disallow the evidence. Upon review, we conclude that the District Court did not abuse its discretion in denying the motion for a new trial on the jury misconduct issues.

¶22 Finally, Cooksey contends that defense counsel rendered ineffective assistance by failing to call on Beres during voir dire and thereby discover that her mother knew the decedent. Since we have concluded that the Beres statement during deliberations was not admissible or prejudicial, there was no error to consider in a plain error review.

¶23 *Issue Two: Whether the District Court properly excluded Cooksey's offered evidence concerning the presence of the drug Paxil in the deceased's blood.*

¶24 A district court has broad discretion to determine the relevance and admissibility of evidence, and this Court reviews evidentiary rulings for abuse of discretion. *State v. Passmore*, 2010 MT 34, ¶ 51, 355 Mont. 187, 225 P.3d 1229.

¶25 The State Crime Lab conducted an autopsy of the decedent's body after the shooting, and thereafter sent tissue samples to a laboratory out of state for additional testing. The initial toxicology report from the autopsy showed a number of drugs in the decedent's body, including Methadone. The additional laboratory testing detected the presence of a small, sub-therapeutic level (20 nanograms per milliliter) of the drug Paxil. The defense had copies of the reports from both the State Crime Lab and the out-of-state lab before trial. The defense presented expert testimony at trial through Dr. Bennett as to the autopsy report and the possible effects on the decedent's behavior of the drugs that

9

were detected. The defense contention was that at least some of the drugs could have caused Beardslee to act aggressively.

¶26   During the sixth day of trial the defense first requested leave to call an unidentified person from the out-of-state lab to lay the foundation for admission of that lab's report regarding the Paxil. The defense also requested leave to call Dr. Bennett to testify as to the significance of the Paxil in the decedent's body. The defense contention was that the Paxil could also cause the decedent to act aggressively toward Cooksey.

¶27   The prosecution objected on the ground that the defense had not previously disclosed its intent to use this report and that the report could not be admitted without establishing a proper foundation. The District Court allowed the defense to make an offer of proof through Dr. Bennett about the significance of the Paxil. Dr. Bennett stated that the amount of Paxil was in a "low therapeutic" or "sub therapeutic" range and that Paxil is an antidepressant designed to "cheer you up." He stated that there was "anecdotal evidence" that Paxil can cause suicidal or homicidal behavior, meaning that "there is a claim, a story unproven by testing" that has "never made it through the scientific steps." He had heard of one case in which a person with Paxil in his system had committed murder, but did not know whether the Paxil influenced the conduct.

¶28   The District Court excluded the proposed evidence because the defense had not disclosed it to the prosecution and had not shown good cause for the failure to disclose. Section 46-15-323(5), MCA, requires a defendant to disclose the name of each person he intends to call to support a defense of justifiable use of force. After trial starts, the defense may not call any witness in support of a defense of justifiable use of force if that

witness had not been previously listed, except upon a showing of good cause. The district court may preclude a defendant from calling a witness who was not disclosed. Section 46-15-329(4), MCA; *State v. DeMary*, 2003 MT 307, ¶ 17, 318 Mont. 200, 79 P.3d 817. The District Court's Omnibus Hearing Memorandum entered in October 2009, required both prosecution and defense disclosure of witnesses "immediately and on a continuing basis." Cooksey did not comply with these requirements concerning the Paxil testimony and did not demonstrate any good cause for the failure.

¶29 The proposed testimony of Dr. Bennett, as demonstrated through the defense offer of proof, was not properly expert testimony under M. R. Evid. 702. That Rule provides for expert testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue." Dr. Bennett, even though he previously testified as an expert in the case concerning the other drugs found in the decedent's body, clearly had no scientific, technical or other specialized knowledge about the relationship, if any, between Paxil and aggressive behavior. He stated that his information was merely anecdotal and had not been scientifically tested. The District Court specifically recognized that the proposed evidence was "highly speculative, of questionable relevance, and will, without more, serve to confuse and mislead the jury."

¶30 The jury heard expert testimony about the significance of the drug Methadone in the decedent's body. The tenuous information about Paxil, in addition to its other problems noted above, added nothing to the defense, and exclusion of the proffered Paxil evidence in this case was proper and not an abuse of discretion. *Valley Bank v. Hughes*,

11

2006 MT 285, ¶¶ 42-45, 334 Mont. 335, 147 P.3d 185 (expert in banking properly excluded from testimony because she was not an expert in the crucial standard of care involved in the case).

¶31 *Issue Three:  Whether the State was required to conduct an investigation to discover evidence to support Cooksey's claim of justifiable use of force.*

¶32 This Court reviews de novo a district court's interpretation of a statute.  *State v. Daniels*, 2011 MT 278, ¶ 11, 362 Mont. 426, 265 P.3d 623.  In doing so we are guided by the long-held maxim that legislative intent must first be determined from the plain words used in the statute, and when that is possible no other means of interpretation are proper.  *City of Missoula v. Cox*, 2008 MT 364, ¶ 9, 346 Mont. 422, 196 P.3d 452.  Courts may not disregard the plain language of a statute.  *Bank of America v. Ivey*, 2010 MT 131, ¶ 10, 356 Mont. 388, 234 P.3d 867.  The court's role is to ascertain and declare what is in "terms or in substance contained" in a statute, and not to insert what is omitted or omit what is inserted.  Section 1-2-101, MCA.

¶33 Prior to trial Cooksey filed a "Motion for Compliance with Mont. Codes Ann. § 45-3-112" in which he requested that the District Court order the prosecution to provide a list of specific items including the decedent's complete medical records; all drug and alcohol evaluations of the decedent; the decedent's complete criminal record; a copy of all mental health records of the decedent; and "any other evidence of Mr. Beardslee's violent character to demonstrate the reasonableness of force used by the Defendant."  The District Court conducted a hearing on the motion, and the defense called several County

Sheriff's Deputies to testify regarding whether they had adequately secured the crime scene and whether they had "investigated" Cooksey's claim of justifiable use of force.

¶34 Section 45-3-112, MCA, was enacted in 2009 and provides:

> When an investigation is conducted by a peace officer of an incident that appears to have or is alleged to have involved justifiable use of force, the investigation must be conducted so as to disclose all evidence, including testimony concerning the alleged offense and that might support the apparent or alleged justifiable use of force.

The District Court noted that in all criminal cases the prosecution has a long-established duty to provide to the defense any exculpatory evidence in its possession. *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963); *State v. Ellison*, 2012 MT 50, ¶ 15, 364 Mont. 276, 272 P.3d 646. State statute also imposes broad obligations on the prosecution in all criminal cases to disclose evidence to the defense, § 46-15-322, MCA, and those obligations extend to disclosure of all "material and information" held by staff members and by any other persons who have "participated in the investigation or evaluation of the case." Section 46-15-322(4), MCA.

¶35 The District Court construed § 45-3-112, MCA, to reflect these established obligations, and to require the prosecution to disclose any evidence it had that was relevant to the defense of justifiable use of force. At the hearing on the defense motion, the District Court stated:

> Effectively the defense argues that law enforcement has an independent duty under this set of statutes to conduct a separate investigation into the claim of self-defense. I guess I don't go that far on my reading of the statute. It just appears to me that they're obligated to conduct a thorough investigation, which may or may not include issues regarding self defense.

13

If they do gather evidence that is potentially exculpatory, or supports the affirmative defense of self-defense, then they had a duty to disclose it to the defense.

The District Court's order further noted that evidence of aggressive or violent tendencies of the decedent must have been known to Cooksey prior to the homicide before they could be relevant, consistent with established Montana law. *State v. Branham*, 2012 MT 1, ¶ 10, 363 Mont. 281, 269 P.3d 891. The District Court required the prosecution to produce the decedent's criminal record for in-camera inspection.

¶36 The District Court refused to construe § 45-3-112, MCA, to impose any new and independent duty for law enforcement to investigate cases involving justifiable use of force. On appeal Cooksey does little to explain how § 45-3-112, MCA, requires or supports a dismissal of the homicide charge against him. He points to nothing in the language of the statute that requires that law enforcement conduct an independent investigation for the defense in every justifiable use of force case and points to no language requiring dismissal of charges. He points to no actual or even potential evidence that was relevant to justifiable use of force that was lost, withheld or not discovered during the course of the investigation. He points to no classes of potential evidence that contained information relevant to his defense.

¶37 The language of § 45-3-112, MCA, is plain and clear on its face. It requires an officer conducting an investigation in a case involving the defense of justifiable use of force to conduct that investigation so as to "disclose all *evidence*" (emphasis added) that might support the defense. This is consistent with the disclosure obligations upon

14

prosecutors and law enforcement officers arising from the *Brady* case. It is consistent with Montana statutory and case law. Section 45-3-112, MCA, plainly requires that "evidence" that would support the defense of justifiable use of force must be made available for disclosure to the defense. Cooksey has not pointed to any evidence that would support his defense that was not disclosed.

¶38 The District Court's construction of § 45-3-112, MCA, was a correct application of the statute as enacted by the Legislature and we find no error.[1]

¶39 *Issue Four: whether the prosecutor's closing argument amounted to prosecutorial misconduct.*

¶40 This Court reviews a district court's rulings on objections to closing argument content for abuse of discretion. *State v. Green*, 2009 MT 114, ¶ 14, 350 Mont. 141, 205 P.3d 798. Closing argument statements are considered in the context of the entire argument, *State v. Robideaux*, 2005 MT 324, ¶ 15, 329 Mont. 521, 125 P.3d 1114. The defendant must make a timely objection to closing argument statements or the objection is deemed to be waived. *State v. Racz*, 2007 MT 244, ¶ 36, 339 Mont. 218, 168 P.3d 685. We will undertake plain error review of closing argument objections not stated at trial if we are persuaded that the prosecutor's comments resulted in a manifest miscarriage of

---

[1] The dissent argues at length that § 45-3-112, MCA, imposes a special investigative duty upon law enforcement officers to uncover evidence "not yet" in their possession, applicable only to cases that do or might involve a claim of justifiable use of force. There is nothing in the statute that covers evidence "not yet" in the possession of investigators and it is far from clear how such evidence could even be identified. In the end, and recognizing the many general rules of statutory construction, the dissent's argument is just that: an alternative way to construe the statute by adding certain concepts to it.

justice, undermined the fundamental fairness of the trial, or compromised the integrity of the judicial process. *Racz*, ¶ 36.

¶41 Cooksey points to two statements made during the prosecution's closing argument. The first:

> We certainly have chased our tails a bit over the last two weeks. But please remember that the defendant has an absolute right to go to trial and to be tried by his peers, you folks sitting here. He has that right no matter how much evidence there is against him. The defendant in a trial is not required, and especially in this trial, is not required to prove anything. It is solely the State's burden to prove this case beyond a reasonable doubt.

Cooksey did not object to this comment at trial. Cooksey also challenges the prosecution's last statement in closing, urging the jury: "Find this man guilty. Protect society. And protect your neighbors." The defense objected contemporaneously, requesting that the jury be admonished to disregard the remark. The District Court sustained the objection by admonishing the jury to "disregard that remark."

¶42 As to the first remark concerning the volume of evidence, Cooksey contends that it implied that he was abusing the system by exercising his right to a jury trial. He contends in a brief footnote that this Court should consider this as "plain error" even though there was no contemporaneous objection. We decline to do so. Cooksey's brief contains no cogent argument or analysis as to why plain error review should be invoked in this case. We invoke plain error only sparingly, on a case-by-case basis, where failing to do so may result in a manifest miscarriage of justice, may leave unsettled the fundamental fairness of the trial, or may compromise the integrity of the judicial process. *State v. West*, 2008 MT 338, ¶ 23, 346 Mont. 244, 194 P.3d 683. We perceive no such situation in this case

16

with regard to the cited remarks. *See State v. Staat*, 251 Mont. 1, 10, 822 P.2d 643, 648-49 (1991) (prosecutor may comment on the volume of evidence).

¶43     The prosecutor's last comment admonishing the jury to protect society and their neighbors drew a prompt objection from the defense and a request that the jury be admonished. The District Court did so, admonishing the jury to disregard the remark. Prompt cautionary instructions can cure the prejudicial effect of a remark made in closing argument when the jury is cautioned to disregard the statement. *Ariegwe*, ¶ 166; *State v. Dubois*, 2006 MT 89, ¶ 61, 332 Mont. 44, 134 P.3d 82.

¶44     The District Court's admonishment, together with the instructions given to the jury, clearly undermines Cooksey's contention that there was an abuse of discretion. The District Court instructed the jury to decide the case uninfluenced by passion or prejudice, and to not be biased against the defendant because he was arrested, charged or tried for the offense because none of those facts is evidence of guilt. The District Court instructed the jury that they may not be governed by sentiment, conjecture, sympathy, passions, prejudice, public opinion or public feeling because both sides had the right to expect a conscientious and dispassionate verdict, weighing the evidence and applying the law. The District Court instructed the jury that the evidence of one witness was sufficient to prove any fact, and that they were not to decide based upon the number of witnesses called. The District Court instructed that the State has the burden to prove guilt beyond a reasonable doubt; that the defendant is presumed innocent; and that the defendant is not required to prove his innocence or even to present any evidence.

¶45 Considering the relevant circumstances, Cooksey has not demonstrated that he is entitled to a new trial because of the content of the closing argument.

CONCLUSION

¶46 The motion for a new trial based on juror misconduct was properly denied. The District Court had the discretion to exclude Cooksey's proffered evidence regarding the presence of a small amount of the drug Paxil in the decedent's blood. The investigation of the crime was conducted in compliance with § 45-12-112, MCA. Cooksey failed to establish that the prosecution's statements during closing argument constituted unfairly prejudicial misconduct.

¶47 On June 24, 2011, Bobby Cooksey's wife Debra appeared in this case through counsel and moved to intervene in the appeal to raise issues concerning satisfaction of restitution ordered as part of Bobby Cooksey's sentence. This Court granted that motion over the State's objection that Debra Cooksey had no standing to intervene in Bobby Cooksey's appeal of his criminal conviction. The District Court determined that Debra Cooksey failed to support her claim of ownership in the property or her claim that the property was exempt from execution to satisfy the restitution owed by Bobby Cooksey. Bobby Cooksey did not raise any issue on appeal concerning his sentence or the portion of the sentence that required him to pay restitution. After further consideration this Court has concluded that the motion to intervene was improvidently granted.

¶48 For the reasons stated above, the motion of Debra Cooksey to intervene is denied.

¶49    The conviction and sentence are affirmed.


/S/ MIKE McGRATH


We concur:

/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ BRIAN MORRIS


Justice James C. Nelson, concurring in part and dissenting in part.

¶50    What follows are my views on the Court's resolution of the present case and *State v. Mitchell*, 2012 MT 227, ___ Mont. ___, ___ P.3d ___.  Both Cooksey and Mitchell argue the application of § 45-3-112, MCA, to the facts of their respective cases, and the Assistant Attorneys General representing the State in these two cases respond to the defendants' arguments with somewhat overlapping, but nevertheless distinct analyses of the statute.  It thus facilitates my discussion to address both cases at once.  In referring to the Court's Opinions, I shall cite either "*Cooksey*, ¶ ___" or "*Mitchell*, ¶ ___."

¶51    I concur in the Court's decision as to Issues One, Two, and Four of *Cooksey* (juror misconduct, exclusion of the Paxil evidence, and prosecutorial misconduct, respectively).  However, regarding what went on in the church basement prior to voir dire, I believe Cooksey raises credible concerns about the potential taint of the jury pool, and I thus specially concur in this part of Issue One (*Cooksey*, ¶¶ 11-12, 14-17).  As to Issue Three of *Cooksey* and Issues One and Two of *Mitchell*, the Court resolves these issues based on

its construction of § 45-3-112, MCA. In my view, the Court completely emasculates this statute, and I thus dissent from these portions of the *Cooksey* and *Mitchell* decisions.

¶52 I shall address the jury matter in *Cooksey* first, followed by the statutory question in both *Cooksey* and *Mitchell*.

### I. Potential Taint of the Jury Pool in *Cooksey*

¶53 In resolving the "church basement" issue, the Court does *not* hold that the "circus atmosphere" described by prospective juror Lurie was appropriate or harmless. Rather, the Court concludes that there was no circus atmosphere in the first place. The Court reaches this conclusion by discounting all of Lurie's testimony, noting that the District Court rejected Lurie's version of events as not credible. *Cooksey*, ¶¶ 16-17.

¶54 I agree that Cooksey has not demonstrated any grounds for impugning the District Court's credibility determination. Lurie, however, was not the only witness to testify regarding potentially prejudicial conversations among the venire. Prospective juror Newman testified that she was in the church basement with other veniremembers for approximately one and a half to two hours. While there, she observed prospective juror Simms "letting people know his thoughts on Cooksey's case." Simms was "talking loud and making comments about Mr. Cooksey." He expressed the view that what Cooksey did was not right—that "it's not right to shoot somebody in cold blood." Juror Beres also testified that Simms made comments to others in the church basement, although she could not remember specifically what Simms said.

¶55 Hence, even if there was not a "circus atmosphere" in the church basement, there is unrefuted testimony that at least one of the prospective jurors was discussing the case

with other prospective jurors and expressing the view that Cooksey's self-defense claim lacked merit. Indeed, it would be naïve to assume that 80 individuals summoned for jury duty and detained together for nearly two hours in a church basement would not discuss the reason they were there and what they may or may not know about the case. If nothing else, common sense dictates that when a group of ordinary citizens are called for a particular purpose and then are put together in a room, more likely than not they are going to discuss what they know about the purpose for which they were called and the people involved. This natural tendency is exacerbated when the group includes one or more loudmouths, such as Simms, who are more than willing to parade their "inside" knowledge and self-inflated opinions about the case before their fellow citizens.

¶56 It is a fundamental tenet of our criminal justice system, and a matter of constitutional law, that a person accused of a crime is entitled to a fair trial by an "impartial jury." *State v. Kingman*, 2011 MT 269, ¶ 18, 362 Mont. 330, 264 P.3d 1104; U.S. Const. amends. VI, XIV; Mont. Const. art. II, §§ 17, 24. Indeed, "[t]he accused has a fundamental right to have that most basic of all decisions (guilt or innocence) made by an impartial jury." *State v. Good*, 2002 MT 59, ¶ 65, 309 Mont. 113, 43 P.3d 948 (citing *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642 (1961)). "It is incontrovertible that jury impartiality goes to the very integrity of our justice system, and that the right to an impartial jury is so essential to our conception of a fair trial that its violation cannot be considered harmless error." *State v. Herrman*, 2003 MT 149, ¶ 22, 316 Mont. 198, 70 P.3d 738; *accord State v. Lamere*, 2005 MT 118, ¶ 24, 327 Mont. 115, 112 P.3d 1005.

¶57 It is also well-established that "the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Parker v. Gladden*, 385 U.S. 363, 364, 87 S. Ct. 468, 470 (1966) (per curiam) (internal quotation marks omitted); *accord Putro v. Baker*, 147 Mont. 139, 148, 410 P.2d 717, 722 (1966) ("The function of the jury is to decide the facts of the case only on evidence introduced at trial."). Extraneous influences on jurors, such as opinions about the defendant's guilt or reputation, can be so prejudicial as to deprive the defendant of his right to a fair trial. *Parker*, 385 U.S. at 363-66, 87 S. Ct. at 470-71; *Tong Xiong v. Felker*, 681 F.3d 1067, 1075-76 (9th Cir. 2012); *State v. McMahon*, 271 Mont. 75, 79, 894 P.2d 313, 316 (1995); *State v. Holmes*, 207 Mont. 176, 182-83, 674 P.2d 1071, 1074 (1983). " 'We cannot be too strict in guarding trials by juries from improper influences.' " *McMahon*, 271 Mont. at 80, 894 P.2d at 316 (quoting *Putro*, 147 Mont. at 148, 410 P.2d at 722).

¶58 Given the importance of safeguarding jurors from improper influences, the District Court's failure to admonish the veniremembers not to discuss any knowledge or opinions they might have about Cooksey's case is perplexing. In its order denying Cooksey's motion for a new trial, the District Court explained its reasons for holding the prospective jurors in the church basement. Due to the diminutive size of the courtroom and the jury room, the size of the prospective jury pool, and the likely media and public presence, the District Court reasoned that "staging or housing" the prospective jurors in the church basement (with bailiffs in attendance) would provide some measure of comfort and security to the veniremembers while at the same time providing accommodation for the

22

attorneys, the prospective witnesses, the victim's and the defendant's families, the public, and the media. The District Court also reasoned that this approach would minimize potential communication and contact between the prospective jurors and others.

¶59 Yet, just as important is the need to minimize potential communication about the case among the veniremembers themselves—a consideration the District Court failed to address. In its order, the court observed that neither the prosecution nor the defense had asked the court to admonish the prospective jurors not to speak about the case or voice their opinions prior to the commencement of voir dire. The court also opined that such an admonishment "is not mandated by any statute, case, or rule to this Court's knowledge." Contrary to the District Court's reasoning, however, "the role of the trial judge is to regulate the proceedings and ensure that the trial is fair." *State v. Price*, 2006 MT 79, ¶ 21, 331 Mont. 502, 134 P.3d 45; *see also e.g. State v. Couture*, 2010 MT 201, ¶ 78, 357 Mont. 398, 240 P.3d 987 (the trial court has an affirmative constitutional obligation to bring the defendant to trial in a timely manner; thus, the court may set deadlines and hold the parties strictly to those deadlines); *State v. Forsyth*, 233 Mont. 389, 418-19, 761 P.2d 363, 381-82 (1988) (on questions of venue, the trial court must "take . . . action designed to insure that a fair trial may be had"). We have confirmed that the trial court should instruct on all essential questions of law and, to that end, "may offer its own instructions." *State v. Sheppard*, 253 Mont. 118, 123, 832 P.2d 370, 373 (1992). It follows, then, that a trial court is not barred from taking action, sua sponte, designed to safeguard the jury from improper influences. In point of fact, the Supreme Court has made clear that while it is virtually impossible to shield jurors from every contact or

23

influence that might theoretically affect their vote, due process requires the trial court to take steps "to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S. Ct. 940, 946 (1982). Along these same lines, this Court has advised trial courts to instruct prospective jurors not to volunteer the substance of any comments or opinions they may have about the parties. *McMahon*, 271 Mont. at 81, 894 P.2d at 317.

¶60 The District Court dismissed our *McMahon* advisement as applicable only "during the course of voir dire." Similarly, the State argues on appeal that Simms' remarks do not warrant reversal because they were made prior to voir dire. Such reasoning elevates form over substance[1] and is plainly inconsistent with the principles discussed in *Smith* and *McMahon*. Whether veniremembers are tainted by improper comments from other prospective jurors during voir dire or while waiting two hours in a church basement for voir dire to begin, the result is the same: the accused's fundamental right to be tried by an impartial jury is infringed. Contrary to the State's arguments, once the skunk is in the barn, one can neither ignore nor early on forget the stink.

¶61 Therefore, I would admonish the trial courts—to the extent they are not already doing so—to sua sponte instruct the venire at the outset, and reinstruct the jury when it is sworn, not to discuss anything pertaining to the case unless it is received in evidence at the trial and the case is submitted to the jury for deliberation. Bailiffs also should be instructed to strictly enforce this rule and to promptly report violations of the same to the presiding judge. These sorts of instructions in the present case might have forestalled the

---

[1] "The law respects form less than substance." Section 1-3-219, MCA.

problems with juror Beres injecting her anecdotal knowledge about Beardslee into the jury's deliberations (*Cooksey*, ¶¶ 13, 18-22) and Simms shooting off his mouth about Cooksey in the church basement (*Cooksey*, ¶¶ 11-12, 14-17).

¶62   All of that said, I am not persuaded on the record here that Simms' comments were so "egregious and prejudicial" as to irreparably "poison[ ]" the entire venire. *McMahon*, 271 Mont. at 81, 894 P.2d at 317.   I do conclude, however, in light of the foregoing discussion, that the District Court's failure to instruct the venire is not only bad practice, but also runs a real risk of depriving a defendant of the right to a fair trial and, thus, should be categorically rejected.

## II.  Interpretation of § 45-3-112, MCA, in *Cooksey* and *Mitchell*

### A.  Introduction

¶63   Section 45-3-112, MCA, states as follows:

> **Investigation of alleged offense involving claim of justifiable use of force.**   When an investigation is conducted by a peace officer of an incident that appears to have or is alleged to have involved justifiable use of force, the investigation must be conducted so as to disclose all evidence, including testimony concerning the alleged offense and that might support the apparent or alleged justifiable use of force.

Cooksey and Mitchell contend that law enforcement failed to comply with this statute.

¶64   In Cooksey's case, Cooksey called 911 immediately after shooting Beardslee.  He told the dispatcher that he had shot Beardslee because Beardslee threatened to kill him. The dispatcher relayed this information to responding officers.  Yet, despite Cooksey's explanation, two of the deputy sheriffs later admitted under questioning that they had done "nothing" to investigate whether Cooksey acted in self-defense.  The State points

out that the Musselshell County Sheriff's Office ultimately referred the investigation of the shooting to the Montana State Division of Criminal Investigation (DCI) and that DCI then became the "lead" investigating agency. It seems the State's position is that the responding deputies had no duty to comply with the statute because they were not the "primary" or "lead" investigators—an absurd argument given that (1) the deputies were the *only* investigators at that point and (2) the statute makes no such distinction but, instead, applies to all "investigation[s]" conducted by "peace officer[s]." In any event, the State does not identify any self-defense investigation by DCI officers either. Consequently, Cooksey maintains that because law enforcement did "nothing" to investigate his claim of self-defense, evidence of Beardslee's Paxil use was not uncovered until a month before trial, which in turn culminated in the District Court's exclusion of the evidence based on the prosecution's (somewhat ironic, if not brazen) argument of unfair surprise. *See Cooksey*, ¶¶ 26-28.

¶65     In Mitchell's case, Mitchell and Corbin were involved in a physical altercation during which Mitchell saw Corbin reach for what Mitchell thought was a knife. Mitchell yelled to a bystander to call the police, saying that Corbin had tried to pull a knife on him. The bystander called 911, reported the fight and its location, and advised the dispatcher that a knife was involved. Officers quickly arrived at the scene and broke up the fight. Mitchell told the officers that Corbin had reached for a knife in his back pocket and that Mitchell had responded by "putting Corbin on the ground and holding him there." In talking with Corbin, the officers discovered that Corbin had a Leatherman or Gerber multi-tool in a case attached to his belt. One of the tools in a multi-tool is a small blade,

26

which can be used as a weapon. Corbin told the officers that he had reached for the multi-tool during the altercation in an attempt to "bluff" Mitchell, but Corbin denied that he had removed the multi-tool from its case. The officers saw the multi-tool on Corbin's belt and knew what it was, but they neither confiscated it nor took any pictures of it. As they later explained at trial, the officers did not believe the multi-tool was "an issue" in their investigation, nor did they believe that their investigation involved securing evidence relating to Mitchell's allegation of self-defense. Mitchell contends the officers' failure to inspect, take pictures of, or confiscate Corbin's weapon violated § 45-3-112, MCA, and resulted in the loss of "key evidence" to his affirmative defense.

## B. Rules of Construction

¶66 The initial step in analyzing these claims is to determine what § 45-3-112, MCA, actually requires. In construing the statute, I am guided by certain well-settled rules of statutory construction.

¶67 First, and especially relevant to this case, we presume that the Legislature does not pass useless or meaningless legislation. *State v. Johnson*, 2012 MT 101, ¶ 20, 365 Mont. 56, 277 P.3d 1232; *Hendershott v. Westphal*, 2011 MT 73, ¶ 20, 360 Mont. 66, 253 P.3d 806; *Mont. Sports Shooting Assn. v. State*, 2008 MT 190, ¶ 15, 344 Mont. 1, 185 P.3d 1003; *see also* § 1-3-232, MCA ("An interpretation which gives effect is preferred to one which makes void."). "In construing a statute, this Court presumes that the legislature intended to make some change in existing law by passing it." *Cantwell v. Geiger*, 228 Mont. 330, 333-34, 742 P.2d 468, 470 (1987); *accord Mont. Sports Shooting*, ¶ 15. We therefore reject an interpretation that would render a statute an "idle act[ ]" or that treats a

statute "as mere surplusage." *Formicove, Inc. v. Burlington Northern, Inc.*, 207 Mont. 189, 194, 673 P.2d 469, 471 (1983); *accord Mont. Sports Shooting*, ¶ 15.  We harmonize statutes relating to the same subject in order to give effect to each statute.  *Johnson*, ¶ 20; *Hendershott*, ¶ 20; § 1-2-101, MCA.

¶68    Second, "[i]n interpreting a statute, we look first to the plain meaning of the words it contains.  Where the language is clear and unambiguous, the statute speaks for itself and we will not resort to other means of interpretation.  In this regard, words used by the legislature must be given their usual and ordinary meaning." *Rocky Mt. Bank v. Stuart*, 280 Mont. 74, 80, 928 P.2d 243, 246-47 (1996) (citations omitted); *see also City of Missoula v. Cox*, 2008 MT 364, ¶ 9, 346 Mont. 422, 196 P.3d 452 ("Whenever the language of a statute is plain, simple, direct and unambiguous, it does not require construction, but construes itself." (brackets and internal quotation marks omitted)); § 1-2-106, MCA ("Words and phrases used in the statutes of Montana are construed according to the context and the approved usage of the language . . . .").

¶69    Third, in the construction of a statute, this Court's job is "simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA.  As a corollary to this rule, we may not create an ambiguity where none exists, nor may we rewrite a statute, by ignoring clear and unambiguous language, in order to accomplish what we may feel is a more sensible or palatable purpose. *State ex rel. Palagi v. Regan*, 113 Mont. 343, 351-52, 126 P.2d 818, 824 (1942); *Dodd v. City of East Helena*, 180 Mont. 518, 521-22, 591 P.2d 241, 243 (1979); *E.W. v. D.C.H.*, 231 Mont. 481, 489, 754 P.2d

28

817, 821 (1988); *State v. Thompson*, 243 Mont. 28, 33, 792 P.2d 1103, 1107 (1990), *overruled on other grounds*, *State v. Spreadbury*, 2011 MT 176, ¶ 10, 361 Mont. 253, 257 P.3d 392; *Bank of America v. Ivey*, 2010 MT 131, ¶ 10, 356 Mont. 388, 234 P.3d 867; *cf. Heggem v. Capitol Indem. Corp.*, 2007 MT 74, ¶ 22, 336 Mont. 429, 154 P.3d 1189.

### C. Statutory Analysis

¶70 The State contends, and the Court likewise concludes, that § 45-3-112, MCA, is clear and unambiguous and, therefore, that the legislative intent can be determined by the plain meaning of the words used in the statute. *Cooksey*, ¶¶ 32, 37. I agree.

¶71 Again, § 45-3-112, MCA, states:

> **Investigation of alleged offense involving claim of justifiable use of force.** When an investigation is conducted by a peace officer of an incident that appears to have or is alleged to have involved justifiable use of force, the investigation must be conducted so as to disclose all evidence, including testimony concerning the alleged offense and that might support the apparent or alleged justifiable use of force.

¶72 Of all the proffered constructions of this language in the two cases—by Cooksey, by Mitchell, by the Assistant Attorneys General, and by the Court—the Court's is the most extreme and implausible. The Court says that § 45-3-112, MCA, does not impose any new duty on law enforcement, but instead merely "reflects long-established obligations regarding thorough and complete police investigations and requirements that the prosecution disclose any evidence in the government's possession that is relevant to the defense of justifiable use of force." *Mitchell*, ¶ 16; *see also Cooksey*, ¶¶ 34-35, 37-38 (the statute reflects the "established" obligations of "prosecutors and law enforcement" to

29

"ma[k]e available for disclosure" any exculpatory evidence "held by" or "in [the] possession" of the government). Not even the Assistant Attorneys General arguing the State's position in these cases propose such a blatant rewriting of the statute.

¶73 We all know that the prosecution has an affirmative duty under the Due Process Clause to disclose exculpatory and impeachment evidence to the defense. This has been the law for nearly half a century. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963); *Kyles v. Whitley*, 514 U.S. 419, 432-33, 115 S. Ct. 1555, 1565 (1995); *Benn v. Lambert*, 283 F.3d 1040, 1052-53 (9th Cir. 2002); *State v. St. Dennis*, 2010 MT 229, ¶¶ 46-47, 358 Mont. 88, 244 P.3d 292; *State v. Ellison*, 2012 MT 50, ¶¶ 15-16, 364 Mont. 276, 272 P.3d 646. The disclosure obligation has also been a statutory requirement for several decades. *See* § 95-1803, RCM (enacted 1967); §§ 46-15-301, -302, MCA (1979 to 1985); § 46-15-322, MCA (1985 to present). The obligation applies not only to prosecutors, but also to persons who have participated in the investigation or evaluation of the case. *Kyles*, 514 U.S. at 437-38, 115 S. Ct. at 1567-68; § 46-15-322(4), MCA.

¶74 Section 45-3-112, MCA, in contrast, does not mention "prosecutors." Rather, the statute refers specifically to "a peace officer." It is axiomatic that this Court may not insert the word "prosecutors" into the statute, § 1-2-101, MCA, and the Court is wrong for doing so. Furthermore, it strains credulity beyond the breaking point to conclude, as the Court does, that the Legislature enacted § 45-3-112, MCA, out of the blue in 2009 merely to "reflect" disclosure requirements which already existed, and had been in place for well over 40 years, under *Brady* and § 46-15-322, MCA. Indeed, the bill by which § 45-3-112, MCA, was enacted articulates what the statute's purpose is, and it is not to

30

"reflect" extant disclosure requirements. Rather, "the purpose of [§§ 45-3-110, -111, and -112, MCA] is to clarify and secure the ability of the people to protect themselves."[2] Laws of Montana, 2009, ch. 332, preamble. The Court's interpretation runs contrary not only to this stated purpose, but also to the presumption that the Legislature does not pass useless or meaningless legislation. *Johnson*, ¶ 20; *Hendershott*, ¶ 20; *Mont. Sports Shooting*, ¶ 15. "Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." Section 1-2-101, MCA. "An interpretation that gives effect is always preferred to one that makes a statute void or treats a statute as mere surplusage." *Formicove*, 207 Mont. at 194, 673 P.2d at 471. Regrettably, the Court ignores these principles in the present case.

¶75 Instead of duplicating extant disclosure requirements applicable to evidence which is *already* "held by" or "in the possession" of prosecutors and investigators, the statute imposes a new duty on peace officers to uncover evidence which is *not yet* in the possession of law enforcement or prosecutors—as evidenced by the statute's focus on the *investigation*. First off, it is important to note that the statute is triggered "[w]hen an investigation is conducted by a peace officer of an incident that appears to have or is alleged to have involved justifiable use of force." The statute does not impose an affirmative obligation to *commence* an investigation, and I thus disagree with Cooksey's and Mitchell's contentions that the statute creates a duty to investigate. If a person walks up to Officer Smith and says, "I just shot Joe in self-defense," the officer may have a duty

---

[2] Section 45-3-110, MCA, concerns the duty to retreat or summon help when threatened with bodily injury or loss of life. Section 45-3-111, MCA, grants authority to openly carry and display a weapon.

31

to investigate the incident, but this statute is not the source of that duty. What the statute says is this: *When* a peace officer conducts an investigation of an incident, and the incident appears to have involved, or is alleged to have involved, justifiable use of force, then the statute is triggered.

¶76 The statute directs the peace officer who finds himself in this situation to conduct the investigation in a particular way. Specifically, "the investigation must be conducted so as to disclose all evidence, including testimony concerning the alleged offense and that might support the apparent or alleged justifiable use of force." Thus, while the statute does not impose a duty to commence an investigation, it does impose a duty where an investigation has been commenced, and the duty is to conduct the investigation as the statute specifies. Indeed, the State concedes in both *Cooksey* and *Mitchell* that the statute imposes "the duty to conduct [the] criminal investigation in a way that will result in full disclosure to the defendant of all 'evidence.' " The question is: What "evidence" is the statute referring to?

¶77 In the State's view, the statute is referring to evidence that is "generated" or "discovered" during the investigation and in the State's possession. This interpretation, however, like the Court's construction, would render the statute "mere surplusage" and an "idle act." *Formicove*, 207 Mont. at 194, 673 P.2d at 471. Full disclosure of all evidence generated or discovered during an investigation and in the State's possession is already required by *Brady* and § 46-15-322, MCA. We must harmonize §§ 45-3-112 and 46-15-322, MCA, to give effect to each, *Johnson*, ¶ 20; *Hendershott*, ¶ 20; § 1-2-101,

32

MCA, and we must presume that in passing § 45-3-112, MCA, the Legislature "intended to make some change in existing law," *Cantwell*, 228 Mont. at 334, 742 P.2d at 470.

¶78 Section 45-3-112, MCA, is not part of the discovery statutes (Title 46, chapter 15, part 3, MCA). It is part of the justifiable use of force statutes (Title 45, chapter 3, MCA). As noted, it is one of three statutes whose stated "purpose . . . is to clarify and secure the ability of the people to protect themselves." Laws of Montana, 2009, ch. 332, preamble. The statute's focus is on "the investigation," which must be conducted so as to "disclose all evidence." To *investigate* is "to observe or study by close examination and systematic inquiry." *Merriam-Webster's Collegiate Dictionary* 616 (10th ed., Merriam-Webster 1997); *accord Black's Law Dictionary* 902 (Bryan A. Garner ed., 9th ed., Thomson Reuters 2009) ("[t]o inquire into (a matter) systematically"). To *disclose* is "to expose to view" or "to make known or public." *Merriam-Webster's Collegiate Dictionary* 330; *cf. Black's Law Dictionary* 531 (*disclosure* is "[t]he act or process of making known something that was previously unknown; a revelation of facts."). Hence, the statute's requirement is not merely that the peace officer "expose" or "make known" the evidence which he happens to have "generated" or "discovered" during his investigation. Rather, it is that the peace officer affirmatively "generate" or "discover" (to borrow the Attorney General's words) *all* of the evidence which may exist.

¶79 In other words, the statute requires the peace officer to conduct his investigation so as to expose or make known "all" evidence—*including evidence that the State has not yet uncovered and does not yet have in its possession*. The Court asserts that "it is far from clear how such evidence could even be identified." *Cooksey*, ¶ 38 n. 1. I disagree. The

33

statute says *exactly* how such evidence is to be identified: through the peace officer's "investigation," which must be conducted so as to expose or make known "all" evidence. That is the plain and obvious purpose of the statute, given its focus on "the investigation" and its use of the term "all evidence." There is no other reason why the Legislature enacted this statute and thus effected a change in existing law by doing so. When an incident involves or appears to involve justifiable use of force, the Legislature has decided, as a matter of public policy, that an investigating peace officer must tailor his investigation so that "all" evidence, including testimony concerning the alleged offense and that might support the apparent or alleged justifiable use of force, is discovered, exposed, and made known. Presumably, any peace officer who conducts a thorough investigation will uncover such evidence anyway. But § 45-3-112, MCA, now makes this a matter of statutory duty. Once such evidence is uncovered pursuant to § 45-3-112, MCA, the State must *then* disclose it to the defense pursuant to § 46-15-322, MCA.[3]

### D. The State's Additional Arguments

¶80 Besides presenting its argument (with which I disagree) as to the "plain reading" of § 45-3-112, MCA, the State argues two other theories for why the statute should not be interpreted to impose any new duties on peace officers. The State's arguments in this

---

[3] While the legislative intent is, in my view, quite clear, "disclose" arguably was not the best term for the Legislature to use in § 45-3-112, MCA, given that this is a term of art generally associated with *Brady* and the discovery statutes. Perhaps stating that the investigation must be conducted so as to "expose," "reveal," "uncover," or "discover" all evidence would have effectuated the Legislature's purpose without inviting the argument, which this Court now adopts, that § 45-3-112, MCA, merely "reflects" decades-old disclosure requirements which already exist under *Brady* and § 46-15-322, MCA.

regard involve considerations extrinsic to the statutory language. I believe it is important to acknowledge these theories and explain why I disagree with them as well.

### 1. The Role of Peace Officers in the Adversarial System

¶81 First, the State resists the notion that peace officers should have any duty to investigate on behalf of the defense. The State cites a slew of this Court's cases which have recognized that police officers have no affirmative duty to collect exculpatory evidence and are not required to assist the defendant with procuring evidence on his own behalf. *See State v. Heth*, 230 Mont. 268, 271-72, 750 P.2d 103, 105 (1988); *State v. Clark*, 234 Mont. 222, 225, 762 P.2d 853, 855-56 (1988); *State v. Sadowski*, 247 Mont. 63, 79, 805 P.2d 537, 547 (1991), *overruled on other grounds*, *State v. Ayers*, 2003 MT 114, ¶¶ 74-76, 315 Mont. 395, 68 P.3d 768; *State v. Patton*, 280 Mont. 278, 284-85, 930 P.2d 635, 638-39 (1996); *State v. Belgarde*, 1998 MT 152, ¶ 16, 289 Mont. 287, 962 P.2d 571; *State v. Saxton*, 2003 MT 105, ¶ 32, 315 Mont. 315, 68 P.3d 721; *State v. Seiffert*, 2010 MT 169, ¶ 15, 357 Mont. 188, 237 P.3d 669.

¶82 As an initial observation, the State's citation of these cases serves only to *bolster* my conclusions concerning § 45-3-112, MCA. First, each of the foregoing cases was decided under pre-2009 law. As such, they represent the law as it existed in 2009 when the Legislature enacted § 45-3-112, MCA. We noted in *Heth* that police officers "have no affirmative duty to gather [exculpatory] evidence *absent express statutory mandate*." 230 Mont. at 272, 750 P.2d at 105 (emphasis added). Second, in construing a statute, this Court presumes "that the Legislature acted with deliberation and with full knowledge of all existing laws on a subject," *State v. Brown*, 2009 MT 452, ¶ 10, 354 Mont. 329, 223

35

P.3d 874, and "that the legislature intended to make some change in existing law by passing [the statute]," *Cantwell*, 228 Mont. at 333-34, 742 P.2d at 470. It follows, then, that the Legislature intended to change the law reflected in the foregoing cases cited by the State, such that where police officers *before* did not have a duty to collect exculpatory evidence or assist the defendant with procuring evidence on his own behalf, they *now* have a duty to conduct their investigations (in cases involving justifiable use of force) so as to discover, expose, and make known all such evidence.

¶83 I appreciate the premise, implicit in the State's argument, that our criminal justice system is based on the adversarial model, and that it is generally up to a criminal defendant to discover and gather her own evidence in support of a self-defense claim. There are exceptions to the adversarial nature of our system, however—the disclosure requirements of *Brady* being one example. "By requiring the prosecutor to assist the defense in making its case, the *Brady* rule represents a limited departure from a pure adversary model." *United States v. Bagley*, 473 U.S. 667, 675 n. 6, 105 S. Ct. 3375, 3380 n. 6 (1985). The rationale is that "the prosecutor's role transcends that of an adversary: he 'is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.' " *Bagley*, 473 U.S. at 675 n. 6, 105 S. Ct. at 3380 n. 6 (ellipses in original) (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 633 (1935)); *accord State ex rel. Fletcher v. Nineteenth Jud. Dist. Ct.*, 260 Mont. 410, 415, 859 P.2d 992, 995 (1993) ("[A] prosecutor should seek justice and not simply an indictment or a conviction."). Tellingly, the State cites no provision of law precluding the Legislature

36

from modifying the adversarial system—in a way similar to *Brady* and § 46-15-322, MCA—such that peace officers are required to essentially assist the defendant with the investigation of cases involving justifiable use of force.

¶84 The State notes that the investigation of crimes by law enforcement necessarily involves "judgment," "discretion," and "latitude." That may be true most of the time; however, the Legislature has lessened the extent of that discretion and latitude when it comes to cases involving apparent or alleged justifiable use of force, and has directed peace officers specifically how their investigations are to be conducted in such cases. At bottom, the State's arguments regarding the appropriate duties of peace officers in our adversarial system are more properly addressed to the Legislature, not this Court. As the State well knows, the role of the Judicial Branch is to interpret and apply the statutes as written and consistent with legislative intent. Sections 1-2-101, -102, MCA. It is not our prerogative to assume the role of pseudo-legislators and manipulate clear statutory mandates in order to achieve some presumed greater good. When we engage in such activity, it only gives traction to those who would criticize courts and judges for rewriting the laws that a coordinate branch of government has enacted.

### 2. The Remarks of Two Senators

¶85 The State's second argument is premised on remarks made by two senators at a subcommittee hearing in March 2009. The State explains that House Bill 228 (HB 228), introduced during the 2009 legislative session, was a rather controversial bill dealing with gun rights and the justifiable use of force in numerous respects. *See* Laws of Montana, 2009, ch. 332 (titled "An Act Preserving and Clarifying Laws Relating to the Right of

Self-Defense and the Right to Bear Arms . . . .").  The bill had been introduced, but not passed, during the previous two legislative sessions.  *See* HB 693 (2005); HB 340 (2007).  When HB 228 came before the 2009 Senate Judiciary Committee, that body appointed a three-member subcommittee which, according to the State, "substantially rewrote the original bill."  I note, however, that the section of HB 228 which ultimately became § 45-3-112, MCA, was *not* rewritten in any way material to this case.  In fact, essentially the same language was used in the corresponding sections of HB 693 (2005) and HB 340 (2007).  Each of the three bills stated that "the investigation [of an incident involving self-defense/justifiable use of force] must be conducted so as to disclose all evidence."

¶86    In any event, the three-member subcommittee consisted of Senators Shockley, Jent, and McGee.  During the subcommittee's March 20, 2009 hearing, Senator Jent opined that the section of HB 228 which later became § 45-3-112, MCA, "is duplicative of current law, Brady versus Maryland and 46-15-323 [sic] . . . because they already got to give you evidence that would get you off now under constitutional precedent and under the Code."  Senator Jent thus proposed that this section be stricken from the bill.  In response, however, Senator Shockley argued that while the section is "poorly worded" and "say[s] what's already in the Code," it "doesn't hurt nothing."  From this snippet of discussion among two senators in a subcommittee hearing, the State leaps to the conclusion that "[t]he legislators voting for this bill did not believe they were effecting a sea change in the law requiring law enforcement officers to take the place of defense investigators . . . ."

¶87 There are three reasons why I find this argument to be wholly unpersuasive. First of all, the State candidly admits that this argument is presented only "[t]o the extent this Court determines the statutory language is not clear and unambiguous." And, as the State points out elsewhere in its briefs, the statutory language is plain, clear, and unambiguous. Pursuant to our rules of construction, "[w]here the language is clear and unambiguous, the statute speaks for itself and we will not resort to other means of interpretation." *Rocky Mt. Bank*, 280 Mont. at 80, 928 P.2d at 246; *accord Cooksey*, ¶ 32. Hence, there is no reason here to consider the remarks of two senators in a subcommittee hearing.

¶88 Second, the State's suggestion that we should attribute dispositive significance to such remarks presents separation-of-powers concerns. As we all know, "[t]he power of the government of this state is divided into three distinct branches—legislative, executive, and judicial," and "[n]o person or persons charged with the exercise of power properly belonging to one branch shall exercise any power properly belonging to either of the others . . . ." Mont. Const. art. III, § 1. Equally fundamental is the principle that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803); *accord Mont. Petroleum Tank Release Compen. Bd. v. Crumleys, Inc.*, 2008 MT 2, ¶ 57, 341 Mont. 33, 174 P.3d 948 ("interpreting and upholding the law" is a "constitutionally designated role[ ]" of the courts); *Best v. Police Dept. of Billings*, 2000 MT 97, ¶ 16, 299 Mont. 247, 999 P.2d 334 (the doctrine of separation of powers between branches of government is "[c]losely related" to the fundamental principle that "it is the province and duty of the judiciary 'to say what the law is' "). What these principles mean here is that while it is the province of

39

legislators to enact the laws, it is the province of judges to interpret them. Regardless of what Senators Shockley and Jent may have said about § 45-3-112, MCA, their views do not dictate the meaning of the statutory language that was actually *used and adopted* by the Legislature. As a matter of constitutional law, that determination is made by this Court applying our rules of statutory construction, and it is based on what the statute *actually says*, not what we want it to say or what others may have conjectured it says. The statute's plain language controls, and legislative history cannot be used to show that an apparently clear and unambiguous text does not mean what it says. *Johnson*, ¶ 26; *State v. Merry*, 2008 MT 288, ¶ 12, 345 Mont. 390, 191 P.3d 428.

¶89 Third, it is preposterous, quite frankly, to suggest that the remarks of 2 senators during a subcommittee hearing represent what the other 148 members of the Legislature "believed" when they voted on the bill. We do not know which other senators and representatives, if any (besides Senator McGee), were aware of Senator Shockley's and Senator Jent's views. Nor do we know whether any senators and representatives agreed with those views. Indeed, it is entirely possible—if not more likely—that some of the senators and representatives who voted for the bill agreed with the views of Gary Marbut, the self-professed "primary developer" of HB 228 and the legislation's chief proponent. Marbut appeared before the House and Senate Judiciary Committees. In addition to his verbal remarks in support of the bill, Marbut provided legislators with a typewritten, section-by-section explanation of the bill's provisions. That document is included as Exhibit 3 to the House Judiciary Committee's January 22, 2009 Minutes. Regarding the section that ultimately became § 45-3-112, MCA, Marbut explained:

40

> [This section] requires that investigators look for and collect all evidence, including evidence that could exonerate a person claiming self-defense. Investigators say that this need is already included in their professional standards for investigation. If that is so, they shouldn't object to this requirement being placed in statute, another clarification needed in existing law. Further, citizens shouldn't be required to rely on changeable occupational standards drawn by un-elected organizations of public employees in order for citizens to stay out of prison.

Clearly, the Court's construction of § 45-3-112, MCA, is contrary to what the "primary developer" of HB 228 had in mind. Of course, just as we do not know how many legislators were aware of and subscribed to the views of Senators Shockley and Jent, we do not know how many legislators read Marbut's explanation and "believed" that it reflected the true meaning of § 45-3-112, MCA. And that points up the futility of attempting to discern statutory meaning from the various, and often times inconsistent, comments and opinions offered by legislators, proponents, and opponents during committee hearings: It is utterly impossible to discern who heard them, who agreed with them, and whether they represented the "beliefs" of those who voted for the bill.

¶90 In any event, and more to the point, what the legislators "believed" is not the issue. The Montana Constitution gives legal effect to the "laws" the Legislature enacts, Mont. Const. art. V, § 11(1), not the personal beliefs of its members. *Cf. Graham County Soil & Water Conserv. Dist. v. United States ex rel. Wilson*, ___ U.S. ___, 130 S. Ct. 1396, 1411 (2010) (Scalia, J., concurring in part and concurring in the judgment) ("The Constitution gives legal effect to the 'Laws' Congress enacts, Art. VI, cl. 2, not the objectives its Members aimed to achieve in voting for them."). The intent of those laws is manifested in *the text of the bills* which the majority of the legislators voted to enact,

41

not in the audio recordings of off-the-cuff remarks made by two senators during a subcommittee hearing.[4] Mont. Const. art. V, § 11(1); § 1-2-101, MCA; *Johnson*, ¶ 26.

¶91 In sum, § 45-3-112, MCA, clearly and unambiguously provides that when an incident involves or appears to involve justifiable use of force, a peace officer who is investigating the incident must conduct the investigation so that all evidence, including testimony concerning the alleged offense and that might support the apparent or alleged justifiable use of force, is disclosed, i.e., discovered, exposed, and made known. I now consider the statute's application to Cooksey's and Mitchell's cases.

## E. Application

¶92 There is no dispute that Cooksey and Mitchell "alleged" justifiable use of force. Officers were aware from the outset that Cooksey and Mitchell claimed they had acted in self-defense. Thus, the statute was triggered in both cases. The question is whether the investigating officers conducted their investigations so as to disclose all evidence that might support the alleged justifiable use of force.

---

[4] For this reason, I disagree with this Court's practice of considering statements by proponents of legislation, which we have done even without a threshold determination that the statute at issue is ambiguous. *See e.g. Thornton v. Flathead County*, 2009 MT 367, ¶ 20, 353 Mont. 252, 220 P.3d 395 (citing a portion of the legislative record containing the statements of a lobbyist regarding the meaning of the legislation); *Tally Bissell Neighbors, Inc. v. Eyrie Shotgun Ranch, LLC*, 2010 MT 63, ¶ 24, 355 Mont. 387, 228 P.3d 1134 (citing two portions of the legislative record containing statements by various lobbyists—including, notably, Gary Marbut); *Grenz v. Mont. Dept. of Nat. Res. & Conserv.*, 2011 MT 17, ¶ 26, 359 Mont. 154, 248 P.3d 785 (citing a portion of the legislative record containing statements by various lobbyists); *CBI, Inc. v. McCrea*, 2012 MT 167, ¶ 26, 365 Mont. 512, ___ P.3d ___ (Baker, J., dissenting) (citing statements by various proponents). Even if a lobbyist's views and expectations influence legislators' "belief" as to what certain legislation does or does not mean or what the legislation will or will not accomplish, it is ultimately *the language of the statute* that controls.

¶93 In Cooksey's case, the investigators failed to discover evidence of Beardslee's Paxil use. Testimony concerning Beardslee's Paxil use "*might* support [Cooksey's] . . . alleged justifiable use of force." Section 45-3-112, MCA (emphasis added). Hence, the evidence falls within the parameters of the statute. Of course, there might be cases where a peace officer conducts the investigation in such a way that disclosure of all potentially relevant evidence should result, yet certain evidence simply eludes discovery. It may be necessary in such a case to consider whether the failure to unearth "all" potentially relevant evidence in existence constitutes a violation of the statute. But that is not the situation here. The officers admittedly made *no effort at all* to investigate whether Cooksey had acted in self-defense. Indeed, the responding deputies testified that they had done "nothing" to investigate his allegation, and the State tacitly concedes that the DCI officers likewise did nothing to investigate Cooksey's claim.

¶94 As for Mitchell's case, the officers did not believe their investigation involved securing evidence related to Mitchell's allegation of self-defense. Of course, the existence of the evidence at issue (the multi-tool attached to Corbin's belt) was already known by Mitchell. Yet, the officers placed Mitchell under arrest and took him into custody at the scene. At that point, the officers had the authority to reasonably search the immediate area "for the purpose of . . . discovering and seizing any persons, instruments, articles, or things which may have been used in the commission of or which may constitute evidence of the offense." Section 46-5-102(4), MCA. The officers did not do so. Furthermore, even absent the fact that Mitchell was in custody, it is absurd to suggest

(as the State does here) that he should have attempted to wrest the multi-tool from Corbin for purposes of securing it as evidence. That was the officers' job.

¶95    Indeed, that we now effectively require the victim who defends against an assault to secure the weapon used in the attack is unconscionable. Typically, victims who defend themselves have no more urgent objective than to save themselves from personal harm or death in whatever way they can. If they accomplish that—and live to tell about it—the law should not require that they then gather the evidence which would support their justifiable-use-of-force defense so as to preserve that evidence against loss, alteration, or destruction. Ordinary citizens are not trained in the technicalities of gathering forensic evidence; thus, even assuming the victim attempted to gather such evidence, there is every reason to believe the evidence would be challenged at trial based on any number of objections—e.g., that the chain of custody or a secure storage was not maintained; or that the evidence was altered or tampered with; or that fingerprints, DNA, or trace evidence was not preserved. If we adopt any rule, it should be that evidence-gathering should be left to the experts—peace officers and crime scene investigators. The contrary rule suggested by the State, and effectively adopted by the Court, does not even pass the common-sense test.

¶96    Given that the stated purpose of § 45-3-112, MCA, is "to . . . secure the ability of the people to protect themselves" (Laws of Montana, 2009, ch. 332, preamble), and given that Mitchell had informed the officers that he acted to protect himself when he assaulted Corbin, it would be nonsensical to conclude that the officers, who admittedly were aware of evidence that "might" support Mitchell's claim of justifiable use of force, did not need

44

to take steps to secure and preserve that evidence. Leaving the multi-tool in Corbin's possession, rather than seizing and preserving it as evidence, constituted a gross failure by the officers to comply with the purpose, spirit, and "substance" of § 45-3-112, MCA. *See* § 1-2-101, MCA.

¶97 For these reasons, I would hold that the statute was violated in Cooksey's and Mitchell's cases.

### F. Relief

¶98 The question arises as to the proper remedy for these violations. This Court has recognized that the requirements of a statute "could be meaningless unless there [is] an 'incentive' for officials to follow its requirements." *State v. Strong*, 2010 MT 163, ¶ 13, 357 Mont. 114, 236 P.3d 580 (quoting *State v. Benbo*, 174 Mont. 252, 259, 570 P.2d 894, 899 (1977)). The *Strong* and *Benbo* cases involved the statutory requirement that a person arrested must be taken "without unnecessary delay" before the nearest and most accessible judge for an initial appearance. Section 46-7-101(1), MCA. This statute does not identify any sanction for a violation of its requirement of a prompt initial appearance. *Strong*, ¶ 12. As a result, this Court had to fashion a remedy—an authority we possess "based upon our supervisory power over lower courts." *Strong*, ¶ 13. The remedy, we explained, must be sufficient "to insure that 'rights declared in words [not become] lost in reality.'" *Strong*, ¶¶ 13-14 (brackets in original) (quoting *Miranda v. Arizona*, 384 U.S. 436, 443, 86 S. Ct. 1602, 1612 (1966)). The remedy employed in *Benbo* was suppression of evidence against the defendant obtained during the period of unnecessary delay before the initial appearance. 174 Mont. at 262, 570 P.2d at 900. The remedy in *Strong* was

45

dismissal of the charge. *Strong*, ¶ 15. The Court held that the dismissal was without prejudice, but noted that dismissal with prejudice may be warranted where the defendant shows "material prejudice" arising from the unnecessary delay in providing an initial appearance. *Strong*, ¶¶ 19-20.

¶99 In the present two cases, I have serious concerns about the investigating officers' flagrant disregard of the requirements imposed on them by the plain and unambiguous language of § 45-3-112, MCA—specifically, to conduct their investigations (in cases involving justifiable use of force) so as to discover, expose, and make known "all" evidence, including testimony concerning the alleged offense and that might support the apparent or alleged justifiable use of force. Given the persistence and determination of HB 228's proponents, given the legislation's passage by wide margins (40-10 in the Senate; 85-14 in the House), and given Marbut's understanding that § 45-3-112, MCA, would require investigators to "*look for and collect* all evidence, including evidence that could exonerate a person claiming self-defense" (emphasis added), I have little doubt that efforts will be undertaken to overturn this Court's blatant neutering of the statute. At that time, it may be prudent to consider incorporating appropriate remedies or "incentives" into the statute so as to ensure that law enforcement complies with whatever duties the Legislature decides to *re*-impose on peace officers.

¶100 Cooksey suggests that the proper remedy in his case is to grant a new trial, while Mitchell argues that the proper remedy for him is to dismiss the charge. Our decision in *Strong* supports the premise that there is not necessarily one single remedy for every violation of a statute's mandates and that the appropriate remedy must be determined

based on the unique facts of each case. Here, however, since the Court has interpreted § 45-3-112, MCA, into oblivion, no purpose would be served in analyzing whether dismissal, a new trial, or another remedy would be appropriate to address noncompliance with the statute. Suffice it to say that, in my view, the statute was violated in both cases and some form of remedy should exist to deter such violations in the future.

### III. Conclusion

¶101 In summary, I concur on Issues One, Two, and Four of *Cooksey*. As to Issue One specifically, while I believe that Cooksey has raised credible concerns about the potential taint of the jury pool in his case, I am not persuaded that Simms' remarks in the church basement were so egregious and prejudicial as to irreparably poison the entire jury panel. Nevertheless, I conclude that the District Court's failure to instruct the venire is not only bad practice, but also runs a real risk of depriving a defendant of the right to a fair trial and, thus, should be categorically rejected. I would admonish the trial courts—to the extent they are not already doing so—to sua sponte instruct the venire at the outset, and reinstruct the jury when it is sworn, not to discuss anything pertaining to the case unless it is received in evidence at the trial and the case is submitted to the jury for deliberation. Bailiffs also should be instructed to strictly enforce this rule and to promptly report violations of the same to the presiding judge.

¶102 As to Issue Three of *Cooksey* and Issues One and Two of *Mitchell*, I dissent from the Court's statutory construction. " '[All judges] know how to mouth the correct legal rules with ironic solemnity while avoiding those rules' logical consequences.' " *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 500, 113 S. Ct. 2711, 2742

47

(1993) (O'Connor, White, & Souter, JJ., dissenting) (brackets in original) (quoting *Garnes v. Fleming Landfill, Inc.*, 413 S.E.2d 897, 907 (W.Va. 1991)). And that is exactly what the Court does here—acknowledging that we may not disregard the plain language and substance of a statute, *Cooksey*, ¶ 32, but then interpreting the statute contrary to its plain intent so as to render it utterly superfluous, *Cooksey*, ¶ 37. Based on my analysis above, I conclude that § 45-3-112, MCA, clearly and unambiguously requires that when an incident involves or appears to involve justifiable use of force, a peace officer who is investigating the incident must conduct the investigation so that all evidence, including testimony concerning the alleged offense and that might support the apparent or alleged justifiable use of force, is disclosed, i.e., is discovered, exposed, and made known. I would hold that the statute was violated in both *Cooksey* and *Mitchell*.

¶103 In closing, there may be many who disagree with the notion that peace officers should be required to conduct investigations on behalf of criminal defendants. Indeed, the legislative record reflects that numerous individuals—law enforcement and private citizens—spoke out against the adoption of HB 228. Nevertheless, our elected leaders voted to enact the legislation, and it is not this Court's job "to protect the people from the consequences of their political choices." *Natl. Fedn. of Indep. Bus. v. Sebelius*, ___ U.S. ___, 132 S. Ct. 2566, 2579 (2012) (opinion of Roberts, C.J.).

¶104 It is this Court's solemn obligation to apply the law enacted by the Legislature, not to rewrite the law to suit our "better view" of what we think the law *should* be. In our decision here, we have grossly violated this fundamental principle of the constitutional separation of powers. I cannot agree, and I strongly dissent.

48

Justice Jim Rice, concurring and dissenting.

¶105   I concur in the Court's resolution of Issues One, Two, and Four.  I dissent from Issue Three and join Justice Nelson's analysis of § 45-3-112, MCA, set forth at ¶¶ 63-79 of his concurring and dissenting opinion.

/S/ JIM RICE