JUSTICE NELSON,
concurring in part and dissenting in part.
¶50 What follows are my views on the Court’s resolution of the present case and State v. Mitchell, 2012 MT 227, 366 Mont. 379, 286 P.3d 1196. Both Cooksey and Mitchell argue the application of § 45-3-112, MCA, to the facts of their respective cases, and the Assistant Attorneys General representing the State in these two cases respond to the defendants’ arguments with somewhat overlapping, but nevertheless distinct analyses of the statute. It thus facilitates my discussion to address both cases at once. In referring to the Court’s Opinions, I shall cite either “Cooksey, ¶_” or “Mitchell, ¶_.”
*359 ¶51 I concur in the Court’s decision as to Issues One, Two, and Four of Cooksey (juror misconduct, exclusion of the Paxil evidence, and prosecutorial misconduct, respectively). However, regarding what went on in the church basement prior to voir dire, I believe Cooksey raises credible concerns about the potential taint of the jury pool, and I thus specially concur in this part of Issue One (Cooksey, ¶¶ 11-12,14-17). As to Issue Three of Cooksey and Issues One and Two of Mitchell, the Court resolves these issues based on its construction of § 45-3-112, MCA. In my view, the Court completely emasculates this statute, and I thus dissent from these portions of the Cooksey and Mitchell decisions.
¶52 I shall address the jury matter in Cooksey first, followed by the statutory question in both Cooksey and Mitchell.
I. Potential Taint of the Jury Pool in Cooksey
¶53 In resolving the “church basement” issue, the Court does not hold that the “circus atmosphere” described by prospective juror Lurie was appropriate or harmless. Rather, the Court concludes that there was no circus atmosphere in the first place. The Court reaches this conclusion by discounting all of Lurie’s testimony, noting that the District Court rejected Lurie’s version of events as not credible. Cooksey, ¶¶ 16-17.
¶54 I agree that Cooksey has not demonstrated any grounds for impugning the District Court’s credibility determination. Lurie, however, was not the only witness to testify regarding potentially prejudicial conversations among the venire. Prospective juror Newman testified that she was in the church basement with other veniremembers for approximately one and a half to two hours. While there, she observed prospective juror Simms “letting people know his thoughts on Cooksey’s case.” Simms was “talking loud and making comments about Mr. Cooksey.” He expressed the view that what Cooksey did was not right-that “it’s not right to shoot somebody in cold blood.” Juror Beres also testified that Simms made comments to others in the church basement, although she could not remember specifically what Simms said.
¶55 Hence, even if there was not a “circus atmosphere” in the church basement, there is unrefuted testimony that at least one of the prospective jurors was discussing the case with other prospective jurors and expressing the view that Cooksey’s self-defense claim lacked merit. Indeed, it would be naive to assume that 80 individuals summoned for jury duty and detained together for nearly two hours in a church basement would not discuss the reason they were there and what they may or may not know about the case. If nothing else, *360 common sense dictates that when a group of ordinary citizens are called for a particular purpose and then are put together in a room, more likely than not they are going to discuss what they know about the purpose for which they were called and the people involved. This natural tendency is exacerbated when the group includes one or more loudmouths, such as Simms, who are more than willing to parade their “inside” knowledge and self-inflated opinions about the case before their fellow citizens.
¶56 It is a fundamental tenet of our criminal justice system, and a matter of constitutional law, that a person accused of a crime is entitled to a fair trial by an “impartial jury.” State v. Kingman, 2011 MT 269, ¶ 18, 362 Mont. 330, 264 P.3d 1104; U.S. Const. amends. VI, XTV; Mont. Const. art. II, §§ 17, 24. Indeed, “[t]he accused has a fundamental right to have that most basic of all decisions (guilt or innocence) made by an impartial jury.” State v. Good, 2002 MT 59, ¶ 65, 309 Mont. 113, 43 P.3d 948 (citing Irvin v. Dowd, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642 (1961)). “It is incontrovertible that jury impartiality goes to the very integrity of our justice system, and that the right to an impartial jury is so essential to our conception of a fair trial that its violation cannot be considered harmless error.” State v. Herrman, 2003 MT 149, ¶ 22, 316 Mont. 198, 70 P.3d 738; accord State v. Lamere, 2005 MT 118, ¶ 24, 327 Mont. 115, 112 P.3d 1005.
¶57 It is also well-established that “the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant’s right of confrontation, of cross-examination, and of counsel.” Parker v. Gladden, 385 U.S. 363, 364, 87 S. Ct. 468, 470 (1966) (per curiam) (internal quotation marks omitted); accord Putro v. Baker, 147 Mont. 139, 148, 410 P.2d 717, 722 (1966) (“The function of the jury is to decide the facts of the case only on evidence introduced at trial.”). Extraneous influences on jurors, such as opinions about the defendant’s guilt or reputation, can be so prejudicial as to deprive the defendant of his right to a fair trial. Parker, 385 U.S. at 363-66, 87 S. Ct. at 470-71; Tong Xiong v. Felker, 681 F.3d 1067, 1075-76 (9th Cir. 2012); State v. McMahon, 271 Mont. 75, 79, 894 P.2d 313, 316 (1995); State v. Holmes, 207 Mont. 176, 182-83, 674 P.2d 1071, 1074 (1983). “ ‘We cannot be too strict in guarding trials by juries from improper influences.’ ” McMahon, 271 Mont. at 80, 894 P.2d at 316 (quoting Putro, 147 Mont. at 148, 410 P.2d at 722).
¶58 Given the importance of safeguarding jurors from improper influences, the District Court’s failure to admonish the veniremembers not to discuss any knowledge or opinions they might have about *361 Cooksey’s case is perplexing. In its order denying Cooksey’s motion for a new trial, the District Court explained its reasons for holding the prospective jurors in the church basement. Due to the diminutive size of the courtroom and the jury room, the size of the prospective jury pool, and the likely media and public presence, the District Court reasoned that “staging or housing” the prospective jurors in the church basement (with bailiffs in attendance) would provide some measure of comfort and security to the veniremembers while at the same time providing accommodation for the attorneys, the prospective witnesses, the victim’s and the defendant’s families, the public, and the media. The District Court also reasoned that this approach would minimize potential communication and contact between the prospective jurors and others.
¶59 Yet, just as important is the need to minimize potential communication about the case among the veniremembers themselves-a consideration the District Court failed to address. In its order, the court observed that neither the prosecution nor the defense had asked the court to admonish the prospective jurors not to speak about the case or voice their opinions prior to the commencement of voir dire. The court also opined that such an admonishment “is not mandated by any statute, case, or rule to this Court’s knowledge.” Contrary to the District Court’s reasoning, however, “the role of the trial judge is to regulate the proceedings and ensure that the trial is fair.” State v. Price, 2006 MT 79, ¶ 21, 331 Mont. 502, 134 P.3d 45; see also e.g. State v. Couture, 2010 MT 201, ¶ 78, 357 Mont. 398, 240 P.3d 987 (the trial court has an affirmative constitutional obligation to bring the defendant to trial in a timely manner; thus, the court may set deadlines and hold the parties strictly to those deadlines); State v. Forsyth, 233 Mont. 389, 418-19, 761 P.2d 363, 381-82 (1988) (on questions of venue, the trial court must “take ... action designed to insure that a fair trial may be had”). We have confirmed that the trial court should instruct on all essential questions of law and, to that end, “may offer its own instructions.” State v. Sheppard, 253 Mont. 118, 123, 832 P.2d 370, 373 (1992). It follows, then, that a trial court is not barred from taking action, sua sponte, designed to safeguard the jury from improper influences. In point of fact, the Supreme Court has made clear that while it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote, due process requires the trial court to take steps “to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.” Smith v. Phillips, 455 U.S. 209, 217, 102 S. Ct. 940, 946 (1982). Along these same lines, this Court has advised trial courts to *362 instruct prospective jurors not to volunteer the substance of any comments or opinions they may have about the parties. McMahon, 271 Mont. at 81, 894 P.2d at 317.
¶60 The District Court dismissed our McMahon advisement as applicable only “during the course of voir dire.” Similarly, the State argues on appeal that Simms’ remarks do not warrant reversal because they were made prior to voir dire. Such reasoning elevates form over substance[1] and is plainly inconsistent with the principles discussed in Smith and McMahon. Whether veniremembers are tainted by improper comments from other prospective jurors during voir dire or while waiting two hours in a church basement for voir dire to begin, the result is the same: the accused’s fundamental right to be tried by an impartial jury is infringed. Contrary to the State’s arguments, once the skunk is in the barn, one can neither ignore nor early on forget the stink.
¶61 Therefore, I would admonish the trial courts-to the extent they are not already doing so-to sua sponte instruct the venire at the outset, and reinstruct the jury when it is sworn, not to discuss anything pertaining to the case unless it is received in evidence at the trial and the case is submitted to the jury for deliberation. Bailiffs also should be instructed to strictly enforce this rule and to promptly report violations of the same to the presiding judge. These sorts of instructions in the present case might have forestalled the problems with juror Beres injecting her anecdotal knowledge about Beardslee into the jury’s deliberations (Cooksey, ¶¶ 13, 18-22) and Simms shooting off his mouth about Cooksey in the church basement Cooksey, ¶¶ 11-12, 14-17).
¶62 All of that said, I am not persuaded on the record here that Simms’ comments were so “egregious and prejudicial” as to irreparably “poison[ ]” the entire venire. McMahon, 271 Mont. at 81, 894 P.2d at 317. I do conclude, however, in light of the foregoing discussion, that the District Court’s failure to instruct the venire is not only bad practice, but also runs a real risk of depriving a defendant of the right to a fair trial and, thus, should be categorically rejected.
II. Interpretation of § 45-3-112, MCA, in Cooksey and Mitchell A. Introduction
¶63 Section 45-3-112, MCA, states as follows:
Investigation of alleged offense involving claim of justifiable use of force. When an investigation is conducted by *363 a peace officer of an incident that appears to have or is alleged to have involved justifiable use of force, the investigation must be conducted so as to disclose all evidence, including testimony concerning the alleged offense and that might support the apparent or alleged justifiable use of force.
Cooksey and Mitchell contend that law enforcement failed to comply with this statute.
¶64 In Cooksey’s case, Cooksey called 911 immediately after shooting Beardslee. He told the dispatcher that he had shot Beardslee because Beardslee threatened to kill him. The dispatcher relayed this information to responding officers. Yet, despite Cooksey’s explanation, two of the deputy sheriffs later admitted under questioning that they had done “nothing” to investigate whether Cooksey acted in self-defense. The State points out that the Musselshell County Sheriffs Office ultimately referred the investigation of the shooting to the Montana State Division of Criminal Investigation (DCI) and that DCI then became the “lead” investigating agency. It seems the State’s position is that the responding deputies had no duty to comply with the statute because they were not the “primary” or “lead” investigators — an absurd argument given that (1) the deputies were the only investigators at that point and (2) the statute makes no such distinction but, instead, applies to all “investigation[s]” conducted by “peace officers].” In any event, the State does not identify any self-defense investigation by DCI officers either. Consequently, Cooksey maintains that because law enforcement did “nothing” to investigate his claim of self-defense, evidence of Beardslee’s Paxil use was not uncovered until a month before trial, which in turn culminated in the District Court’s exclusion of the evidence based on the prosecution’s (somewhat ironic, if not brazen) argument of unfair surprise. See Cooksey, ¶¶ 26-28.
¶65 In Mitchell’s case, Mitchell and Corbin were involved in a physical altercation during which Mitchell saw Corbin reach for what Mitchell thought was a knife. Mitchell yelled to a bystander to call the police, saying that Corbin had tried to pull a knife on him. The bystander called 911, reported the fight and its location, and advised the dispatcher that a knife was involved. Officers quickly arrived at the scene and broke up the fight. Mitchell told the officers that Corbin had reached for a knife in his back pocket and that Mitchell had responded by “putting Corbin on the ground and holding him there.” In talking with Corbin, the officers discovered that Corbin had a Leatherman or Gerber multi-tool in a case attached to his belt. One of the tools in a multi-tool is a small blade, which can be used as a weapon. Corbin told *364 the officers that he had reached for the multi-tool during the altercation in an attempt to “bluff’ Mitchell, but Corbin denied that he had removed the multi-tool from its case. The officers saw the multitool on Corbin’s belt and knew what it was, but they neither confiscated it nor took any pictures of it. As they later explained at trial, the officers did not believe the multi-tool was “an issue” in their investigation, nor did they believe that their investigation involved securing evidence relating to Mitchell’s allegation of self-defense. Mitchell contends the officers’ failure to inspect, take pictures of, or confiscate Corbin’s weapon violated § 45-3-112, MCA, and resulted in the loss of “key evidence” to his affirmative defense.
B. Rules of Construction
¶66 The initial step in analyzing these claims is to determine what § 45-3-112, MCA, actually requires. In construing the statute, I am guided by certain well-settled rules of statutory construction.
¶67 First, and especially relevant to this case, we presume that the Legislature does not pass useless or meaningless legislation. State v. Johnson, 2012 MT 101, ¶ 20, 365 Mont. 56, 277 P.3d 1232; Hendershott v. Westphal, 2011 MT 73, ¶ 20, 360 Mont. 66, 253 P.3d 806; Mont. Sports Shooting Assn. v. State, 2008 MT 190, ¶ 15, 344 Mont. 1, 185 P.3d 1003; see also § 1-3-232, MCA (“An interpretation which gives effect is preferred to one which makes void.”). “In construing a statute, this Court presumes that the legislature intended to make some change in existing law by passing it.” Cantwell v. Geiger, 228 Mont. 330, 333-34, 742 P.2d 468, 470 (1987); accord Mont. Sports Shooting, ¶ 15. We therefore reject an interpretation that would render a statute an “idle act[ ]” or that treats a statute “as mere surplusage.” Formicove, Inc. v. Burlington Northern, Inc., 207 Mont. 189, 194, 673 P.2d 469, 471 (1983); accord Mont. Sports Shooting, ¶ 15. We harmonize statutes relating to the same subject in order to give effect to each statute. Johnson, ¶ 20; Hendershott, ¶ 20; § 1-2-101, MCA.
¶68 Second, “[i]n interpreting a statute, we look first to the plain meaning of the words it contains. Where the language is clear and unambiguous, the statute speaks for itself and we will not resort to other means of interpretation. In this regard, words used by the legislature must be given their usual and ordinary meaning.” Rocky Mt. Bank v. Stuart, 280 Mont. 74, 80, 928 P.2d 243, 246-47 (1996) (citations omitted); see also City of Missoula v. Cox, 2008 MT 364, ¶ 9, 346 Mont. 422, 196 P.3d 452 (“Whenever the language of a statute is plain, simple, direct and unambiguous, it does not require construction, but construes itself.” (brackets and internal quotation marks omitted)); § 1-2-106, MCA (“Words and phrases used in the *365 statutes of Montana are construed according to the context and the approved usage of the language ....”).
¶69 Third, in the construction of a statute, this Court’s job is “simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted.” Section 1-2-101, MCA. As a corollary to this rule, we may not create an ambiguity where none exists, nor may we rewrite a statute, by ignoring clear and unambiguous language, in order to accomplish what we may feel is a more sensible or palatable purpose. State ex rel. Palagi v. Regan, 113 Mont. 343, 351-52, 126 P.2d 818, 824 (1942); Dodd v. City of East Helena, 180 Mont. 518, 521-22, 591 P.2d 241, 243 (1979); E.W. v. D.C.H., 231 Mont. 481, 489, 754 P.2d 817, 821 (1988); State v. Thompson, 243 Mont. 28, 33, 792 P.2d 1103, 1107 (1990), overruled on other grounds, State v. Spreadbury, 2011 MT 176, ¶ 10, 361 Mont. 253, 257 P.3d 392; Bank of America v. Ivey, 2010 MT 131, ¶ 10, 356 Mont. 388, 234 P.3d 867; cf. Heggem v. Capitol Indem. Corp., 2007 MT 74, ¶ 22, 336 Mont. 429, 154 P.3d 1189.
C. Statutory Analysis
¶70 The State contends, and the Court likewise concludes, that § 45-3-112, MCA, is clear and unambiguous and, therefore, that the legislative intent can be determined by the plain meaning of the words used in the statute. Cooksey, ¶¶ 32, 37.1 agree.
¶71 Again, § 45-3-112, MCA, states:
Investigation of alleged offense involving claim of justifiable use of force. When an investigation is conducted by a peace officer of an incident that appears to have or is alleged to have involved justifiable use of force, the investigation must be conducted so as to disclose all evidence, including testimony concerning the alleged offense and that might support the apparent or alleged justifiable use of force.
¶72 Of all the proffered constructions of this language in the two cases-by Cooksey, by Mitchell, by the Assistant Attorneys General, and by the Court-the Court’s is the most extreme and implausible. The Court says that § 45-3-112, MCA, does not impose any new duty on law enforcement, but instead merely “reflects long-established obligations regarding thorough and complete police investigations and requirements that the prosecution disclose any evidence in the government’s possession that is relevant to the defense of justifiable use of force.” Mitchell, ¶ 16; see also Cooksey, ¶¶ 34-35, 37-38 (the statute reflects the “established” obligations of “prosecutors and law enforcement” to “ma[k]e available for disclosure” any exculpatory evidence “held by” or “in [the] possession” of the government). Not even *366 the Assistant Attorneys General arguing the State’s position in these cases propose such a blatant rewriting of the statute.
¶73 We all know that the prosecution has an affirmative duty under the Due Process Clause to disclose exculpatory and impeachment evidence to the defense. This has been the law for nearly half a century. Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963); Kyles v. Whitley, 514 U.S. 419, 432-33, 115 S. Ct. 1555, 1565 (1995); Benn v. Lambert, 283 F.3d 1040, 1052-53 (9th Cir. 2002); State v. St. Dennis, 2010 MT 229, ¶¶ 46-47, 358 Mont. 88, 244 P.3d 292; State v. Ellison, 2012 MT 50, ¶¶ 15-16, 364 Mont. 276, 272 P.3d 646. The disclosure obligation has also been a statutory requirement for several decades. See § 95-1803, RCM (enacted 1967); §§ 46-15-301, -302, MCA (1979 to 1985); § 46-15-322, MCA (1985 to present). The obligation applies not only to prosecutors, but also to persons who have participated in the investigation or evaluation of the case. Kyles, 514 U.S. at 437-38, 115 S. Ct. at 1567-68; § 46-15-322(4), MCA.
¶74 Section 45-3-112, MCA, in contrast, does not mention “prosecutors.” Rather, the statute refers specifically to “a peace officer.” It is axiomatic that this Court may not insert the word “prosecutors” into the statute, § 1-2-101, MCA, and the Court is wrong for doing so. Furthermore, it strains credulity beyond the breaking point to conclude, as the Court does, that the Legislature enacted § 45-3-112, MCA, out of the blue in 2009 merely to “reflect” disclosure requirements which already existed, and had been in place for well over 40 years, under Brady and § 46-15-322, MCA. Indeed, the bill by which § 45-3-112, MCA, was enacted articulates what the statute’s purpose is, and it is not to “reflect” extant disclosure requirements. Rather, “the purpose of [§§ 45-3-110, -111, and -112, MCA] is to clarify and secure the ability of the people to protect themselves.”[2] Laws of Montana, 2009, ch. 332, preamble. The Court’s interpretation runs contrary not only to this stated purpose, but also to the presumption that the Legislature does not pass useless or meaningless legislation. Johnson, ¶ 20; Hendershott, ¶ 20; Mont. Sports Shooting, ¶ 15. “Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all.” Section 1-2-101, MCA. “An interpretation that gives effect is always preferred to one that makes a statute void or treats a statute as mere surplusage.” Formicove, 207 Mont. at 194, 673 P.2d at 471. Regrettably, the Court *367 ignores these principles in the present case.
¶75 Instead of duplicating extant disclosure requirements applicable to evidence which is already “held by” or “in the possession” of prosecutors and investigators, the statute imposes a new duty on peace officers to uncover evidence which is not yet in the possession of law enforcement or prosecutors-as evidenced by the statute’s focus on the investigation. First off, it is important to note that the statute is triggered “[w]hen an investigation is conducted by a peace officer of an incident that appears to have or is alleged to have involved justifiable use of force.” The statute does not impose an affirmative obligation to commence an investigation, and I thus disagree with Cooksey’s and Mitchell’s contentions that the statute creates a duty to investigate. If a person walks up to Officer Smith and says, “I just shot Joe in self-defense,” the officer may have a duty to investigate the incident, but this statute is not the source of that duty. What the statute says is this: When a peace officer conducts an investigation of an incident, and the incident appears to have involved, or is alleged to have involved, justifiable use of force, then the statute is triggered.
¶76 The statute directs the peace officer who finds himself in this situation to conduct the investigation in a particular way. Specifically, “the investigation must be conducted so as to disclose all evidence, including testimony concerning the alleged offense and that might support the apparent or alleged justifiable use of force.” Thus, while the statute does not impose a duty to commence an investigation, it does impose a duty where an investigation has been commenced, and the duty is to conduct the investigation as the statute specifies. Indeed, the State concedes in both Cooksey and Mitchell that the statute imposes “the duty to conduct [the] criminal investigation in a way that will result in full disclosure to the defendant of all ‘evidence.’ ” The question is: WTiat “evidence” is the statute referring to?
¶77 In the State’s view, the statute is referring to evidence that is “generated” or “discovered” during the investigation and in the State’s possession. This interpretation, however, like the Court’s construction, would render the statute “mere surplusage” and an “idle act.” Formicove, 207 Mont. at 194, 673 P.2d at 471. Full disclosure of all evidence generated or discovered during an investigation and in the State’s possession is already required by Brady and § 46-15-322, MCA. We must harmonize §§ 45-3-112 and 46-15-322, MCA, to give effect to each, Johnson, ¶ 20; Hendershott, ¶ 20; § 1-2-101, MCA, and we must presume that in passing § 45-3-112, MCA, the Legislature “intended to make some change in existing law,” Cantwell, 228 Mont. at 334, 742 P.2d at 470.
*368 ¶78 Section 45-3-112, MCA, is not part of the discovery statutes (Title 46, chapter 15, part 3, MCA). It is part of the justifiable use of force statutes (Title 45, chapter 3, MCA). As noted, it is one of three statutes whose stated “purpose ... is to clarify and secure the ability of the people to protect themselves.” Laws of Montana, 2009, ch. 332, preamble. The statute’s focus is on “the investigation,” which must be conducted so as to “disclose all evidence.” To investigate is “to observe or study by close examination and systematic inquiry.” Merriam-Webster’s Collegiate Dictionary 616 (10th ed., Merriam-Webster 1997); accord Black’s Law Dictionary 902 (Bryan A. Garner ed., 9th ed., Thomson Reuters 2009) (“[t]o inquire into (a matter) systematically”). To disclose is “to expose to view” or “to make known or public.” Merriam-Webster’s Collegiate Dictionary 330; cf. Black’s Law Dictionary 531 (disclosure is “[t]he act or process of making known something that was previously unknown; a revelation of facts.”). Hence, the statute’s requirement is not merely that the peace officer “expose” or “make known” the evidence which he happens to have “generated” or “discovered” during his investigation. Rather, it is that the peace officer affirmatively “generate” or “discover” (to borrow the Attorney General’s words) all of the evidence which may exist.
¶79 In other words, the statute requires the peace officer to conduct his investigation so as to expose or make known “all” evidence — including evidence that the State has not yet uncovered and does not yet have in its possession. The Court asserts that “it is far from clear how such evidence could even be identified.” Cooksey, ¶ 38 n. 1. I disagree. The statute says exactly how such evidence is to be identified: through the peace officer’s “investigation,” which must be conducted so as to expose or make known “all” evidence. That is the plain and obvious purpose of the statute, given its focus on “the investigation” and its use of the term “all evidence.” There is no other reason why the Legislature enacted this statute and thus effected a change in existing law by doing so. When an incident involves or appears to involve justifiable use of force, the Legislature has decided, as a matter of public policy, that an investigating peace officer must tailor his investigation so that “all” evidence, including testimony concerning the alleged offense and that might support the apparent or alleged justifiable use of force, is discovered, exposed, and made known. Presumably, any peace officer who conducts a thorough investigation will uncover such evidence anyway. But § 45-3-112, MCA, now makes this a matter of statutory duty. Once such evidence is uncovered pursuant to § 45-3-112, MCA, the State must then *369 disclose it to the defense pursuant to § 46-15-322, MCA.[3]
D. The State’s Additional Arguments
¶80 Besides presenting its argument (with which I disagree) as to the “plain reading” of § 45-3-112, MCA, the State argues two other theories for why the statute should not be interpreted to impose any new duties on peace officers. The State’s arguments in this regard involve considerations extrinsic to the statutory language. I believe it is important to acknowledge these theories and explain why I disagree with them as well.
1. The Role of Peace Officers in the Adversarial System
¶81 First, the State resists the notion that peace officers should have any duty to investigate on behalf of the defense. The State cites a slew of this Court’s cases which have recognized that police officers have no affirmative duty to collect exculpatory evidence and are not required to assist the defendant with procuring evidence on his own behalf. See State v. Heth, 230 Mont. 268, 271-72, 750 P.2d 103, 105 (1988); State v. Clark, 234 Mont. 222, 225, 762 P.2d 853, 855-56 (1988); State v. Sadowski, 247 Mont. 63, 79, 805 P.2d 537, 547 (1991), overruled on other grounds, State v. Ayers, 2003 MT 114, ¶¶ 74-76, 315 Mont. 395, 68 P.3d 768; State v. Patton, 280 Mont. 278, 284-85, 930 P.2d 635, 638-39 (1996); State v. Belgarde, 1998 MT 152, ¶ 16, 289 Mont. 287, 962 P.2d 571; State v. Saxton, 2003 MT 105, ¶ 32, 315 Mont. 315, 68 P.3d 721; State v. Seiffert, 2010 MT 169, ¶ 15, 357 Mont. 188, 237 P.3d 669.
¶82 As an initial observation, the State’s citation of these cases serves only to bolster my conclusions concerning § 45-3-112, MCA. First, each of the foregoing cases was decided under pre-2009 law. As such, they represent the law as it existed in 2009 when the Legislature enacted § 45-3-112, MCA. We noted in Heth that police officers “have no affirmative duty to gather [exculpatory] evidence absent express statutory mandate.” 230 Mont. at 272, 750 P.2d at 105 (emphasis added). Second, in construing a statute, this Court presumes “that the Legislature acted with deliberation and with full knowledge of all existing laws on a subject,” State v. Brown, 2009 MT 452, ¶ 10, 354 *370 Mont. 329, 223 P.3d 874, and “that the legislature intended to make some change in existing law by passing [the statute],” Cantwell, 228 Mont. at 333-34, 742 P.2d at 470. It follows, then, that the Legislature intended to change the law reflected in the foregoing cases cited by the State, such that where police officers before did not have a duty to collect exculpatory evidence or assist the defendant with procuring evidence on his own behalf, they now have a duty to conduct their investigations (in cases involving justifiable use of force) so as to discover, expose, and make known all such evidence.
¶83 I appreciate the premise, implicit in the State’s argument, that our criminal justice system is based on the adversarial model, and that it is generally up to a criminal defendant to discover and gather her own evidence in support of a self-defense claim. There are exceptions to the adversarial nature of our system, however-the disclosure requirements of Brady being one example. “By requiring the prosecutor to assist the defense in making its case, the Brady rule represents a limited departure from a pure adversary model.” United States v. Bagley, 473 U.S. 667, 675 n. 6, 105 S. Ct. 3375, 3380 n. 6 (1985). The rationale is that “the prosecutor’s role transcends that of an adversary: he ‘is the representative not of an ordinary party to a controversy, but of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done.’ ’’Bagley, 473 U.S. at 675 n. 6, 105 S. Ct. at 3380 n. 6 (ellipses in original) (quoting Berger v. United States, 295 U.S. 78, 88, 55 S. Ct. 629, 633 (1935)); accord State ex rel. Fletcher v. Nineteenth Jud. Dist. Ct., 260 Mont. 410, 415, 859 P.2d 992, 995 (1993) (“[A] prosecutor should seek justice and not simply an indictment or a conviction.”). Tellingly, the State cites no provision of law precluding the Legislature from modifying the adversarial system-in a way similar to Brady and § 46-15-322, MCA-such that peace officers are required to essentially assist the defendant with the investigation of cases involving justifiable use of force.
¶84 The State notes that the investigation of crimes by law enforcement necessarily involves “judgment,” “discretion,” and “latitude.” That may be true most of the time; however, the Legislature has lessened the extent of that discretion and latitude when it comes to cases involving apparent or alleged justifiable use of force, and has directed peace officers specifically how their investigations are to be conducted in such cases. At bottom, the State’s arguments regarding the appropriate duties of peace officers in our adversarial system are more properly addressed to the Legislature, not this Court. As the State well knows, the role of the Judicial Branch is to interpret and *371 apply the statutes as written and consistent with legislative intent. Sections 1-2-101, -102, MCA. It is not our prerogative to assume the role of pseudo-legislators and manipulate clear statutory mandates in order to achieve some presumed greater good. When we engage in such activity, it only gives traction to those who would criticize courts and judges for rewriting the laws that a coordinate branch of government has enacted.
2. The Remarks of Two Senators
¶85 The State’s second argument is premised on remarks made by two senators at a subcommittee hearing in March 2009. The State explains that House Bill 228 (HB 228), introduced during the 2009 legislative session, was a rather controversial bill dealing with gun rights and the justifiable use of force in numerous respects. See Laws of Montana, 2009, ch. 332 (titled “An Act Preserving and Clarifying Laws Relating to the Right of Self-Defense and the Right to Bear Arms ....”). The bill had been introduced, but not passed, during the previous two legislative sessions. See HB 693 (2005); HB 340 (2007). When HB 228 came before the 2009 Senate Judiciary Committee, that body appointed a three-member subcommittee which, according to the State, “substantially rewrote the original bill.” I note, however, that the section of HB 228 which ultimately became § 45-3-112, MCA, was not rewritten in any way material to this case. In fact, essentially the same language was used in the corresponding sections of HB 693 (2005) and HB 340 (2007). Each of the three bills stated that “the investigation [of an incident involving self-defense/justifiable use of force] must be conducted so as to disclose all evidence.”
¶86 In any event, the three-member subcommittee consisted of Senators Shockley, Jent, and McGee. During the subcommittee’s March 20, 2009 hearing, Senator Jent opined that the section of HB 228 which later became § 45-3-112, MCA, “is duplicative of current law, Brady versus Maryland and 46-15-323 [sic] ... because they already got to give you evidence that would get you off now under constitutional precedent and under the Code.” Senator Jent thus proposed that this section be stricken from the bill. In response, however, Senator Shockley argued that while the section is “poorly worded” and “say[s] what’s already in the Code,” it “doesn’t hurt nothing.” From this snippet of discussion among two senators in a subcommittee hearing, the State leaps to the conclusion that “[t]he legislators voting for this bill did not believe they were effecting a sea change in the law requiring law enforcement officers to take the place of defense investigators ....”
¶87 There are three reasons why I find this argument to be wholly *372 unpersuasive. First of all, the State candidly admits that this argument is presented only “[t]o the extent this Court determines the statutory language is not clear and unambiguous.” And, as the State points out elsewhere in its briefs, the statutory language is plain, clear, and unambiguous. Pursuant to our rules of construction, “[w]here the language is clear and unambiguous, the statute speaks for itself and we will not resort to other means of interpretation.” Rocky Mt. Bank, 280 Mont. at 80, 928 P.2d at 246; accord Cooksey, ¶ 32. Hence, there is no reason here to consider the remarks of two senators in a subcommittee hearing.
¶88 Second, the State’s suggestion that we should attribute dispositive significance to such remarks presents separation-of-powers concerns. As we all know, “[t]he power of the government of this state is divided into three distinct branches-legislative, executive, and judicial,” and “[n]o person or persons charged with the exercise of power properly belonging to one branch shall exercise any power properly belonging to either of the others ....” Mont. Const, art. Ill, § 1. Equally fundamental is the principle that “[i]tis emphatically the province and duty of the judicial department to say what the law is.” Marbury v. Madison, 5 U.S. 137, 177 (1803); accord Mont. Petroleum Tank Release Compen. Bd. v. Crumleys, Inc., 2008 MT 2, ¶ 57, 341 Mont. 33, 174 P.3d 948 (“interpreting and upholding the law” is a “constitutionally designated role[ ]” of the courts); Best v. Police Dept. of Billings, 2000 MT 97, ¶ 16, 299 Mont. 247, 999 P.2d 334 (the doctrine of separation of powers between branches of government is “[c]losely related” to the fundamental principle that “it is the province and duty of the judiciary ‘to say what the law is’ ”). What these principles mean here is that while it is the province of legislators to enact the laws, it is the province of judges to interpret them. Regardless of what Senators Shockley and Jent may have said about § 45-3-112, MCA, their views do not dictate the meaning of the statutory language that was actually used and adopted by the Legislature. As a matter of constitutional law, that determination is made by this Court applying our rules of statutory construction, and it is based on what the statute actually says, not what we want it to say or what others may have conjectured it says. The statute’s plain language controls, and legislative history cannot be used to show that an apparently clear and unambiguous text does not mean what it says. Johnson, ¶ 26; State v. Merry, 2008 MT 288, ¶ 12, 345 Mont. 390, 191 P.3d 428.
¶89 Third, it is preposterous, quite frankly, to suggest that the remarks of 2 senators during a subcommittee hearing represent what the other 148 members of the Legislature “believed” when they voted *373 on the bill. We do not know which other senators and representatives, if any (besides Senator McGee), were aware of Senator Shockley’s and Senator Jent’s views. Nor do we know whether any senators and representatives agreed with those views. Indeed, it is entirely possible-if not more likely-that some of the senators and representatives who voted for the bill agreed with the views of Gary Marbut, the self-professed “primary developer” of HB 228 and the legislation’s chief proponent. Marbut appeared before the House and Senate Judiciary Committees. In addition to his verbal remarks in support of the bill, Marbut provided legislators with a typewritten, section-by-section explanation of the bill’s provisions. That document is included as Exhibit 3 to the House Judiciary Committee’s January 22, 2009 Minutes. Regarding the section that ultimately became § 45-3-112, MCA, Marbut explained:
[This section] requires that investigators look for and collect all evidence, including evidence that could exonerate a person claiming self-defense. Investigators say that this need is already included in their professional standards for investigation. If that is so, they shouldn’t object to this requirement being placed in statute, another clarification needed in existing law. Further, citizens shouldn’t be required to rely on changeable occupational standards drawn by un-elected organizations of public employees in order for citizens to stay out of prison.
Clearly, the Court’s construction of § 45-3-112, MCA, is contrary to what the “primary developer” of HB 228 had in mind. Of course, just as we do not know how many legislators were aware of and subscribed to the views of Senators Shockley and Jent, we do not know how many legislators read Marbut’s explanation and “believed” that it reflected the true meaning of § 45-3-112, MCA. And that points up the futility of attempting to discern statutory meaning from the various, and often times inconsistent, comments and opinions offered by legislators, proponents, and opponents during committee hearings: It is utterly impossible to discern who heard them, who agreed with them, and whether they represented the “beliefs” of those who voted for the bill. ¶90 In any event, and more to the point, what the legislators “believed” is not the issue. The Montana Constitution gives legal effect to the “laws” the Legislature enacts, Mont. Const, art. V, § 11(1), not the personal beliefs of its members. Cf. Graham County Soil & Water Conserv. Dist. v. United States ex rel. Wilson,_U.S._, 130 S. Ct. 1396, 1411 (2010) (Scalia, J., concurring in part and concurring in the judgment) (“The Constitution gives legal effect to the ‘Laws’ Congress enacts, Art. VI, cl. 2, not the objectives its Members aimed to achieve *374 in voting for them.”). The intent of those laws is manifested in the text of the hills which the majority of the legislators voted to enact, not in the audio recordings of off-the-cuff remarks made by two senators during a subcommittee hearing.[4] Mont. Const, art. V, § 11(1); § 1-2-101, MCA; Johnson, ¶ 26.
¶91 In sum, § 45-3-112, MCA, clearly and unambiguously provides that when an incident involves or appears to involve justifiable use of force, a peace officer who is investigating the incident must conduct the investigation so that all evidence, including testimony concerning the alleged offense and that might support the apparent or alleged justifiable use of force, is disclosed, i.e., discovered, exposed, and made known. I now consider the statute’s application to Cooksey’s and Mitchell’s cases.
E. Application
¶92 There is no dispute that Cooksey and Mitchell “alleged” justifiable use of force. Officers were aware from the outset that Cooksey and Mitchell claimed they had acted in self-defense. Thus, the statute was triggered in both cases. The question is whether the investigating officers conducted their investigations so as to disclose all evidence that might support the alleged justifiable use of force.
¶93 In Cooksey’s case, the investigators failed to discover evidence of Beardslee’s Paxil use. Testimony concerning Beardslee’s Paxil use “might support [Cooksey’s] ... alleged justifiable use of force.” Section 45-3-112, MCA (emphasis added). Hence, the evidence falls within the parameters of the statute. Of course, there might be cases where a peace officer conducts the investigation in such a way that disclosure of all potentially relevant evidence should result, yet certain evidence simply eludes discovery. It may be necessary in such a case to consider whether the failure to unearth “all” potentially relevant evidence in existence constitutes a violation of the statute. But that is not the *375 situation here. The officers admittedly made no effort at all to investigate whether Cooksey had acted in self-defense. Indeed, the responding deputies testified that they had done “nothing” to investigate his allegation, and the State tacitly concedes that the DCI officers likewise did nothing to investigate Cooksey’s claim.
¶94 As for Mitchell’s case, the officers did not believe their investigation involved securing evidence related to Mitchell’s allegation of self-defense. Of course, the existence of the evidence at issue (the multi-tool attached to Corbin’s belt) was already known by Mitchell. Yet, the officers placed Mitchell under arrest and took him into custody at the scene. At that point, the officers had the authority to reasonably search the immediate area “for the purpose of ... discovering and seizing any persons, instruments, articles, or things which may have been used in the commission of or which may constitute evidence of the offense.” Section 46-5-102(4), MCA. The officers did not do so. Furthermore, even absent the fact that Mitchell was in custody, it is absurd to suggest (as the State does here) that he should have attempted to wrest the multi-tool from Corbin for purposes of securing it as evidence. That was the officers’job.
¶95 Indeed, that we now effectively require the victim who defends against an assault to secure the weapon used in the attack is unconscionable. Typically, victims who defend themselves have no more urgent objective than to save themselves from personal harm or death in whatever way they can. If they accomplish that-and live to tell about it-the law should not require that they then gather the evidence which would support their justifiable-use-of-force defense so as to preserve that evidence against loss, alteration, or destruction. Ordinary citizens are not trained in the technicalities of gathering forensic evidence; thus, even assuming the victim attempted to gather such evidence, there is every reason to believe the evidence would be challenged at trial based on any number of objections-e.g., that the chain of custody or a secure storage was not maintained; or that the evidence was altered or tampered with; or that fingerprints, DNA, or trace evidence was not preserved. If we adopt any rule, it should be that evidence-gathering should be left to the experts-peace officers and crime scene investigators. The contrary rule suggested by the State, and effectively adopted by the Court, does not even pass the commonsense test.
¶96 Given that the stated purpose of § 45-3-112, MCA, is “to ... secure the ability of the people to protect themselves” (Laws of Montana, 2009, ch. 332, preamble), and given that Mitchell had informed the officers that he acted to protect himself when he assaulted Corbin, it *376 would be nonsensical to conclude that the officers, who admittedly were aware of evidence that “might” support Mitchell’s claim of justifiable use of force, did not need to take steps to secure and preserve that evidence. Leaving the multi-tool in Corbin’s possession, rather than seizing and preserving it as evidence, constituted a gross failure by the officers to comply with the purpose, spirit, and “substance” of § 45-3-112, MCA. See § 1-2-101, MCA.
¶97 For these reasons, I would hold that the statute was violated in Cooksey’s and Mitchell’s cases.
F. Relief
¶98 The question arises as to the proper remedy for these violations. This Court has recognized that the requirements of a statute “could be meaningless -unless there [is] an ‘incentive’ for officials to follow its requirements.” State v. Strong, 2010 MT 163, ¶ 13, 357 Mont. 114, 236 P.3d 580 (quoting State v. Benbo, 174 Mont. 252, 259, 570 P.2d 894, 899 (1977)). The Strong and Benbo cases involved the statutory requirement that a person arrested must be taken “without unnecessary delay” before the nearest and most accessible judge for an initial appearance. Section 46-7-101(1), MCA. This statute does not identify any sanction for a violation of its requirement of a prompt initial appearance. Strong, ¶ 12. As a result, this Court had to fashion a remedy-an authority we possess “based upon our supervisory power over lower courts.” Strong, ¶ 13. The remedy, we explained, must be sufficient “to insure that ‘rights declared in words [not become] lost in reality.’ ” Strong, ¶¶ 13-14 (brackets in original) (quoting Miranda v. Arizona, 384 U.S. 436, 443, 86 S. Ct. 1602, 1612 (1966)). The remedy employed in Benbo was suppression of evidence against the defendant obtained during the period of unnecessary delay before the initial appearance. 174 Mont. at 262, 570 P.2d at 900. The remedy in Strong was dismissal of the charge. Strong, ¶ 15. The Court held that the dismissal was without prejudice, but noted that dismissal with prejudice may be warranted where the defendant shows “material prejudice” arising from the unnecessary delay in providing an initial appearance. Strong, ¶¶ 19-20.
¶99 In the present two cases, I have serious concerns about the investigating officers’ flagrant disregard of the requirements imposed on them by the plain and unambiguous language of § 45-3-112, MCA-specifically, to conduct their investigations (in cases involving justifiable use of force) so as to discover, expose, and make known “all” evidence, including testimony concerning the alleged offense and that might support the apparent or alleged justifiable use of force. Given the persistence and determination of HB 228’s proponents, given the *377 legislation’s passage by wide margins (40-10 in the Senate; 85-14 in the House), and given Marbut’s understanding that § 45-3-112, MCA, would require investigators to “look for and collect all evidence, including evidence that could exonerate a person claiming self-defense” (emphasis added), I have little doubt that efforts will be undertaken to overturn this Court’s blatant neutering of the statute. At that time, it may be prudent to consider incorporating appropriate remedies or “incentives” into the statute so as to ensure that law enforcement complies with whatever duties the Legislature decides to re-impose on peace officers.
¶ 100 Cooksey suggests that the proper remedy in his case is to grant a new trial, while Mitchell argues that the proper remedy for him is to dismiss the charge. Our decision in Strong supports the premise that there is not necessarily one single remedy for every violation of a statute’s mandates and that the appropriate remedy must be determined based on the unique facts of each case. Here, however, since the Court has interpreted § 45-3-112, MCA, into oblivion, no purpose would be served in analyzing whether dismissal, a new trial, or another remedy would be appropriate to address noncompliance with the statute. Suffice it to say that, in my view, the statute was violated in both cases and some form of remedy should exist to deter such violations in the future.
IXI. Conclusion
¶101 In summary, I concur on Issues One, Two, and Four of Cooksey. As to Issue One specifically, while I believe that Cooksey has raised credible concerns about the potential taint of the jury pool in his case, I am not persuaded that Simms’ remarks in the church basement were so egregious and prejudicial as to irreparably poison the entire jury panel. Nevertheless, I conclude that the District Court’s failure to instruct the venire is not only bad practice, but also runs a real risk of depriving a defendant of the right to a fair trial and, thus, should be categorically rejected. I would admonish the trial courts-to the extent they are not already doing so-to sua sponte instruct the venire at the outset, and reinstruct the jury when it is sworn, not to discuss anything pertaining to the case unless it is received in evidence at the trial and the case is submitted to the jury for deliberation. Bailiffs also should be instructed to strictly enforce this rule and to promptly report violations of the same to the presiding judge.
¶102 As to Issue Three of Cooksey and Issues One and Two of Mitchell, I dissent from the Court’s statutory construction. “ ‘[All judges] know how to mouth the correct legal rules with ironic solemnity while avoiding those rules’ logical consequences.’ ” TXO *378 Prod. Corp. v. Alliance Resources Corp., 509 U.S. 443, 500, 113 S. Ct. 2711, 2742 (1993) (O’Connor, White, & Souter, JJ., dissenting) (brackets in original) (quoting Garnes v. Fleming Landfill, Inc., 413 S.E.2d 897, 907 (W.Va. 1991)). And that is exactly what the Court does here-acknowledging that we may not disregard the plain language and substance of a statute, Cooksey, ¶ 32, but then interpreting the statute contrary to its plain intent so as to render it utterly superfluous, Cooksey, ¶ 37. Based on my analysis above, I conclude that § 45-3-112, MCA, clearly and unambiguously requires that when an incident involves or appears to involve justifiable use of force, a peace officer who is investigating the incident must conduct the investigation so that all evidence, including testimony concerning the alleged offense and that might support the apparent or alleged justifiable use of force, is disclosed, i.e., is discovered, exposed, and made known. I would hold that the statute was violated in both Cooksey and Mitchell.
¶103 In closing, there may be many who disagree with the notion that peace officers should be required to conduct investigations on behalf of criminal defendants. Indeed, the legislative record reflects that numerous individuals-law enforcement and private citizens-spoke out against the adoption of HB 228. Nevertheless, our elected leaders voted to enact the legislation, and it is not this Court’s job “to protect the people from the consequences of their political choices.” Natl. Fedn. of Indep. Bus. v. Sebelius,_U.S._, 132 S. Ct. 2566, 2579 (2012) (opinion of Roberts, C.J.).
¶104 It is this Court’s solemn obligation to apply the law enacted by the Legislature, not to rewrite the law to suit our “better view” of what we think the law should be. In our decision here, we have grossly violated this fundamental principle of the constitutional separation of powers. I cannot agree, and I strongly dissent.

 “The law respects form less than substance.” Section 1-3-219, MCA.

 Section 45-3-110, MCA, concerns the duty to retreat or summon help when threatened with bodily injury or loss of life. Section 45-3-111, MCA, grants authority to openly carry and display a weapon.

 While the legislative intent is, in my view, quite clear, “disclose” arguably was not the best term for the Legislature to use in § 45-3-112, MCA, given that this is a term of art generally associated with Brady and the discovery statutes. Perhaps stating that the investigation must be conducted so as to “expose,” “reveal,” “uncover,” or “discover” all evidence would have effectuated the Legislature’s purpose without inviting the argument, which this Court now adopts, that § 45-3-112, MCA, merely “reflects” decades-old disclosure requirements which already exist under Brady and § 46-15-322, MCA.

 For this reason, I disagree with this Court’s practice of considering statements by proponents of legislation, which we have done even without a threshold determination that the statute at issue is ambiguous. See e.g. Thornton v. Flathead County, 2009 MT 367, ¶ 20, 353 Mont. 252, 220 P.3d 395 (citing a portion of the legislative record containing the statements of a lobbyist regarding the meaning of the legislation); Tally Bissell Neighbors, Inc. v. Eyrie Shotgun Ranch, LLC, 2010 MT 63, ¶ 24, 355 Mont. 387, 228 P.3d 1134 (citing two portions of the legislative record containing statements by various lobbyists-including, notably, Gary Marbut); Grenz v. Mont. Dept. of Nat. Res. & Conserv., 2011 MT 17, ¶ 26, 359 Mont. 154, 248 P.3d 785 (citing a portion of the legislative record containing statements by various lobbyists); CBI, Inc. v. McCrea, 2012 MT 167, ¶ 26, 365 Mont. 512, _P.3d_(Baker, J„ dissenting) (citing statements by various proponents). Even if a lobbyist’s views and expectations influence legislators’ “belief’ as to what certain legislation does or does not mean or what the legislation will or will not accomplish, it is ultimately the language of the statute that controls.